2004 VT 49

## Joseph C. Jones and Anne J. Jones v. Department of Forests, Parks and Recreation

[857 A.2d 271]

No. 03-017

Present: Dooley, Johnson and Skoglund, JJ., and Pearson, Supr. J. and Gibson, J. (Ret.), Specially Assigned

Opinion Filed June 4, 2004
Motion for Reargument Denied July 28, 2004

*Harry R. Ryan, III* and *John A. Serafino* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Plaintiffs-Appellees.

*William H. Sorrell*, Attorney General, and *Jeanne Elias* and *Rebecca Ellis*, Assistant Attorneys General, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** The State of Vermont Department of Forests, Parks and Recreation appeals from a superior court judgment in favor of landowners Joseph and Anne Jones. The State contends the court erred in ruling that the Department is equitably estopped from asserting that the Joneses violated the forest management plan governing their property in the State's Use Value Appraisal Program (UVA), 32 V.S.A. §§ 3751-3776, and that the Joneses are further entitled to retroactively remove their property from the UVA program under an expired 1996 statute. We agree that the trial court erred, and therefore reverse.

¶ 2. The record evidence may be summarized as follows (additional facts will be adduced as necessary in the discussion section below). In 1980, the Joneses enrolled about 500 acres of their property located in the Town of Mendon in the State's UVA program. The program is designed to provide a tax incentive for landowners to maintain their agricultural or forest land by taxing it at its current use value rather than at the higher "best use" value. See 32 V.S.A. § 3752(12) (defining "use value appraisal" as price land would command if it remained in agricultural or forest use). Forest land is eligible for enrollment in the UVA program only if it is subject to a forest management plan signed by the owner and approved by the Department. *Id.* § 3755(b)(1). Upon enrollment, a lien attaches to the property in exchange for the tax benefit conferred by the program. *Id.* § 3757(f). The lien secures payment of a land use change tax, imposed in the event that any portion of the land is subsequently "developed," *id.*, which may include the cutting of timber in a manner contrary to the forest management plan. *Id.* § 3752(5). The lien runs with the land, but is only payable in the event of development, and only to the extent of the value of that area of the land that has been developed. *Id.* §§ 3757(f), 3757(a). Thus, upon enrollment of the Jones property in the UVA program, a lien of about $78,000 was automatically recorded in the land records of the Town.

¶ 3. The Department, through its inspector James Philbrook, the Rutland County Forester, approved the Joneses' 1980 forest management plan, as well as revised plans in 1985 and 1991. Philbrook inspected the Jones property in August 1985 and noted problems relating to their compliance with the plan, but did not issue an adverse inspection report. See *id.* § 3755(c) (every five years, Department shall inspect enrolled tract to verify that terms of forest management plan have been carried out and shall file adverse inspection report if it finds that management is contrary to conservation or forest management plan). An inspection in December 1988 noted that several scheduled treatments for the property had not been performed, but again recommended continued enrollment in the program.

¶ 4. In August 1992, Philbrook received a report of muddy water in a brook coming from the Jones property, which suggested logging activity. He visited the property on August 20, and observed clear cutting in the area of Stand 5 that was not in conformance with the plan, and evidence of logging activity in the western portion of Stand 1 (the 1991 plan, prepared in consultation with Mark Riley, an experienced forester, had divided the property into five stands numbered 1 through 5). Philbrook testified that he called Mr. Jones after the inspection, advised him that he could lose his UVA eligibility if he failed to conform to the plan, and suggested that he work more closely with his consulting forester, Mark Riley. Riley, apparently in response, sent a memorandum to Philbrook in late September requesting an amendment to the 1991 forest management plan to provide that Stand 5 would be "liquidated" due to "excessive rot." Philbrook approved the amendment.

¶ 5. Rutland County Forester Nathan Fice, who succeeded Philbrook in June 1996, conducted the next conformance inspection of the Jones property in October 1996. Fice discovered three clear-cut areas in Stand 3 that ranged from one to two acres in size. He concluded that these were not in conformance with the forest management plan, which permitted much smaller "selection cuts approximately 40 feet in diameter." Fice also noted heavy logging in portions of Stand 1 contrary to the provisions of the plan, which called for "limited single tree and group selection cut in overstocked areas." Fice returned several days later to take additional measurements, and subsequently filed an adverse inspection report in which he documented the violations and recommended that the Jones property be discontinued from the UVA program for nonconformance with the forest management

plan. See *id.* § 3756(i) (director of division of property valuation and review shall remove from use value appraisal entire parcel of managed forest land when Department has received adverse inspection report). The report was forwarded to the Department of Taxes, which issued a notice of discontinuance withdrawing the Jones property from the UVA program and imposing a land use change tax of $1547. This represented 10% of the fair market value of the 20.3 acres that had been harvested contrary to the plan. See *id.* § 3757(a) (land use change tax must be paid on portion of managed forest land that has been developed).

¶ 6. The Joneses appealed the adverse inspection report to the Commissioner of the Department of Forests, Parks and Recreation. See *id.* § 3758(d). Following a hearing, the Commissioner issued a written decision and findings, affirming the adverse inspection report and determination of noncompliance. The Joneses then appealed to the superior court, which held a de novo evidentiary hearing and issued a written decision in November 2002. As discussed more fully below, the court concluded that the clear cuts in Stand 3 did "not violate the 1991 Forest Management Plan," that the logging in Stand 1 did not result in a violation of the plan, and that the State was equitably estopped from asserting the alleged violations because the Department's inspector had failed to inform the Joneses of the violations within thirty days of his site visit in 1992. See *id.* § 3755(c) (if Department finds that management of tract is contrary to forest management plan, it must file adverse inspection report with owner and director within thirty days of inspection). The court also concluded that the Department's failure to inform the Joneses of the violations in a timely manner had wrongfully deprived them of the opportunity to withdraw their property from the UVA program and extinguish the statutory lien under a 1996 law then in effect. This appeal by the State followed.

## I.

¶ 7. The State raises a number of challenges to the court's decision, which we address in the order most conducive to logical analysis. The State contends that the evidence conclusively established the violations cited in the adverse inspection report that resulted in the Joneses' discontinuance from the UVA program and the imposition of a land use change tax of $1547. While we review the trial court's factual findings for clear error, *Houle v. Quenneville*, 173 Vt. 80, 93, 787 A.2d 1258, 1267 (2001), we treat decisions within the Department's area of expertise with substantial deference. *Sec'y v. Upper Valley Reg'l*

*Landfill Corp.*, 167 Vt. 228, 238, 705 A.2d 1001, 1007 (1997). Applying these standards, we conclude that the court's findings and conclusions are clearly erroneous.

¶ 8. As noted, the adverse inspection report was based on two separate violations of the Joneses' forest management plan. The first involved a series of clear cuts in Stand 3 well in excess of the "approximately 40 feet in diameter" prescribed in the plan. Evidence of the extensive cuts — ranging in size from one to two acres — was uncontroverted. The trial court concluded, nevertheless, that the cuts did not violate the plan because they had "accomplished [its] regeneration" objectives. As explained below, the record evidence fails to support this conclusion.

¶ 9. As described in the forest management plan, Stand 3 consisted largely of aging softwood spruce and fir and included areas mapped as deer yard. The growth management goal for the area, as set forth in the plan, was "Spruce/Fir regeneration by completing group selection cuts approximately 40 feet in diameter" to maintain and enhance winter cover for the deer herd. Nate Fice, the county forester, testified that the extensive clear cuts had resulted in the regeneration of predominantly hardwood trees, in direct contravention of the plan's objective. Although Mark Riley, the Joneses' forest management consultant, claimed that the cuts had accomplished the plan's goal for Stand 3, his testimony that the cuts had resulted in the regeneration of equal percentages of hardwoods and softwoods contradicted the assertion. The court also found that Fice would not have cited the Joneses for a violation if he had known that experienced loggers such as Riley or his subcontractor Randy Wilcox — rather than the Joneses — had marked the areas for cutting, but again there is no support in the record for this finding. Fice testified only that if he had known that Riley or Wilcox marked the cuts he would have asked them to explain their reasons for departing from the clear dictates of the forest management plan. We conclude, therefore, that the court's ruling with respect to Stand 3 was clearly erroneous.

¶ 10. The second alleged violation occurred in a 232-acre section of the Jones property known as Stand 1. There, the management plan called for "limited single tree and group selection cuts" of overstocked areas of hardwoods while "maintain[ing] [an] average BA of 80." "BA" or basal area is a measure of forest density based on the square footage of trees per acre. Fice determined that logging in a 15.8-acre

section of Stand 1 had resulted in a total basal area of 45 square feet, well below — and in direct contravention of — the plan's target of 80.

¶ 11. Nevertheless, the court concluded that the 1992 logging did not result in a basal area below the requirements of the plan. This conclusion was apparently based on its findings that there were no standards for establishing basal area violations in these circumstances, that Fice did not know the basal area of the trees in Stand 1 or the 15.8-acre area prior to the 1992 logging, and that the 15.8-acre section was one that Fice had created to produce a violation. The record does not support these findings.

¶ 12. The 1991 forest management plan stated that the total basal area of Stand 1 was 65, and ranged between 60 and 80. Randy Wilcox, who did the field research and took the measurements for the plan in 1991, testified that he had spent the better part of a day walking the area of Stand 1 and had taken spot measurements. He also recalled that he was in the 15.8-acre section in question, that it was one of two areas that he believed was overstocked and needed cutting, and that — while he did not note a specific basal reading for the area — it was probably *in excess* of the 60 to 80 average for the Stand as a whole.

¶ 13. Thus, the record evidence does not support the court's finding that the basal area of Stand 1 or the specific acreage in question was unknown prior to the logging in 1992. Nor does the record support the court's finding that Fice artificially created a 15.8-acre area to produce a violation. The plan permitted limited logging only in "overstocked" areas, which according to Wilcox consisted of only a few portions of Stand 1, including the 15.8-acre section in question. Fice focused on this area because his inspection revealed extensive evidence of overcutting there. That evidence defined the boundaries for purposes of taking the basal-area measurements. Thus, the 15.8-acre section was not arbitrary or artificially created merely to produce a violation.

¶ 14. Nor does the record support the court's finding that there were no "standards" for determining basal-area violations in large and varying areas such as Stand 1. Based on his training and experience, Fice testified that the cutting in the area clearly violated the plan's call for limited logging in overstocked areas, that the 15.8-acre section of overcutting was large enough under forest management principles to represent a separate stand by itself for purposes of determining basal area measurements, and that his readings supported a finding of nonconformance with the plan. We have cautioned that courts are not "a higher environmental agency entrusted with the power to make environmental law and policy," but rather exercise a "narrow role in

ensuring that the decisions of ANR are made in accordance with law." *Conservation Law Found. v. Burke*, 162 Vt. 115, 126, 645 A.2d 495, 502 (1993). We discern no basis to conclude that the Department's finding of a violation in this case was standardless, unsupported by the evidence, or contrary to law. Accordingly, we conclude that the court's findings were clearly erroneous and must be reversed.

## II.

¶ 15. The State next contends the court erred in concluding that it was equitably estopped from asserting the violations.[1] The elements of equitable estoppel are well established. The party invoking the doctrine has the burden of establishing four essential components: (1) the party to be estopped must know the facts; (2) the party being estopped must intend that his or her conduct shall be acted upon or the acts must be such that the party asserting the estoppel has a right to believe it is so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the conduct of the party to be estopped to his or her detriment. *Agency of Natural Res. v. Godnick*, 162 Vt. 588, 592, 652 A.2d 988, 991 (1994). In addition, we have held that estoppels "against the government are rare and are to be invoked only in extraordinary circumstances," *In re McDonald's Corp.*, 146 Vt. 380, 383, 505 A.2d 1202, 1203-04 (1985), where the "injustice that would ensue from a failure to find an estoppel sufficiently outweighs any effect upon public interest or policy that would result from estopping the government in a particular case." *Godnick*, 162 Vt. at 593, 652 A.2d at 991. Here, it is clear that the first and fourth elements (knowledge and reliance) were not met.

¶ 16. The trial court's decision hinged on its finding that Jim Philbrook, the Department inspector who visited the property in 1992, "was aware of the cuttings that took place on Stands 1 and 3 in 1992" but failed to cite the Joneses for them, as was his duty. See 32 V.S.A. § 3755(c) (if Department finds from inspection that management of tract is contrary to forest management plan or minimum acceptable

---

[1] The court found that the State had waived its right to assert the violations, and was equitably estopped from doing so. Although the State has focused on estoppel, it has also implicitly challenged the waiver finding in asserting that there was no evidence of the common element of knowledge to support either of the court's theories. Accordingly, we reject the Joneses' claim that the State failed to preserve the issue for review on appeal.

standards for forest management, it shall file adverse inspection report within thirty days). "[H]ad the Joneses known that they were in violation of the [p]lan," the court reasoned, they could have availed themselves of a legislative program (since expired) to opt out of the UVA program, extinguish the $78,000 lien on the property, enjoy the then-existing ten percent penalty (rather than the current twenty percent penalty) for violations, and save "tens of thousands of dollars in taxes and penalties" which the State asserts they owed as a result of the violations.

¶ 17. A review of the record reveals no evidence to support the court's finding that the Department's inspector was "aware of the cuttings that took place on Stands 1 and 3 in 1992." Philbrook testified that although he observed some potential violations in Stand 5, he was not in the area of Stand 1 where the cited violations occurred, and observed no logging in Stand 3 out of compliance with the plan. Furthermore, while there was conflicting evidence as to whether the cuts in Stands 1 and 3 had even occurred before Philbrook's visit, the court did not resolve the issue, finding that it was "unknown" whether the areas of the alleged violations in Stands 1 and 3 had been cut when Philbrook visited the property. This finding alone negates the court's contradictory conclusion that Philbrook was aware of the cuts when he visited the property in 1992. The assertion of equitable estoppel against the State thus fails at the threshold, as there is no evidence to show that the Department knew of the violations in 1992 and failed to disclose them. See *Godnick*, 162 Vt. at 592, 652 A.2d at 991 ("the party to be estopped must know the facts").[2]

¶ 18. We note, as well, that the court's finding of detrimental reliance was flawed in several respects. Even assuming, without deciding, that

---

[2] The court also suggested that Philbrook's site visit in 1992 qualified as an inspection under 32 V.S.A. § 3755(c) (requiring inspections every five years to verify conformance with forest management plan), and that he "had an *obligation* to inspect the property thoroughly to determine if there were any violations." (Emphasis added.) This finding could have formed the basis for an argument that Philbrook should have known — or had constructive knowledge — of the violations even if he did not actually observe them, but the court did not ground its decision on such a conclusion. Rather, the court observed that "waiver is the intentional relinquishment of a *known* right," and concluded that the State had waived its right to assert the violations based on its erroneous finding that Philbrook "was *aware* of the cuttings that took place on Stands 1 and 3 in 1992." (Emphasis added.) The finding of an estoppel against the State was similarly based on the court's underlying finding that "the State *knew* of the 1992 cuttings and declined to file an adverse report." Thus, we need not here address the question whether, or under what circumstances, the government may be estopped from asserting a violation based on a prior inspector's *failure* to find the violation.

estoppel against the government could have been based on a failure to disclose a known violation, the court's finding presumed that "had the Joneses known that they were in violation of the [p]lan they could have availed themselves at the time of the legislature's 1992 or 1995 advantageous tax benefit program by withdrawing their property from the [p]lan." The finding overlooks the fact that the Joneses' entire parcel would have been removed from the UVA program upon the filing of an adverse inspection report for nonconformance with the plan under 32 V.S.A. §§ 3755(b)(3) and 3756(i), and they could not have taken advantage of the opt-out program without an enrolled parcel. See 1996, No. 178 (Adj. Sess.), § 292 (providing limited period during which owner of enrolled parcel in UVA program may withdraw property and be relieved of obligations under the program).

¶ 19. The court's finding of detrimental reliance and granting of equitable relief in allowing the Joneses to retroactively exercise the withdrawal provision of the 1996 opt-out legislation also appears to have been based on a mistaken belief that the violations triggered the payment of the $78,000 lien.[3] The two were unrelated. The lien was required only to secure payment of any land use change tax imposed on a portion of the parcel that has been developed, which in this case totaled $1547 on 20.3 acres. See 32 V.S.A. § 3757(f). The Joneses voluntarily paid off the lien under the terms of a later sale of the property to the City of Rutland, which apparently contemplated a resale to the United States Forest Service conditioned upon removal of the lien. Thus, the violations did not trigger the lien payoff. Finally, the court appears to have mistakenly concluded that the State assessed the land use change tax at the current rate of twenty percent of the land's fair market value under 32 V.S.A. § 3757(a), rather than the ten percent rate in effect in 1992. In fact, however, the property was assessed at the ten percent rate.

¶ 20. We hold, in summary, that the record evidence supports the violations specified in the adverse inspection report that resulted in the finding of noncompliance with the forest management plan, withdrawal of the property from the UVA program, and imposition of the land use change tax of $1547. We further hold that the elements of

---

[3] The court had earlier found that "[a]s a result [of the violations], the Joneses were withdrawn from the Program and a lien of nearly $80,000 was imposed on the property," and further observed that "[t]he State now asserts that the Joneses are in violation and as a result, they owe tens of thousands of dollars in taxes and penalties."

waiver and equitable estoppel were not established so as to preclude imposition of the tax or to warrant equitable relief in the form of a retroactive withdrawal of the property from the UVA program under the expired 1996 legislation. Accordingly, the judgment must be reversed, and the $1547 land use change tax reinstated.

*The judgment declaring the State to be estopped from asserting the violations of the land use management plan and the land to have been withdrawn from UVA program effective August 30, 1996, is reversed, and the land use change tax of $1547 resulting from the violations is reinstated.*