2014 VT 50

# In re Appeals of ANR Permits in Lowell Mountain Wind Project (Energize Vermont, Inc., Appellants)

[98 A.3d 16]

No. 13-180

Present: Dooley, Skoglund and Crawford, JJ., and Morse, J. (Ret.), and Pineles, Supr. J. (Ret.), Specially Assigned

Opinion Filed May 23, 2014

*Nathan H. Stearns* and *C. Daniel Hershenson* of *Hershenson, Carter, Scott & McGee, P.C.*, Norwich, for Appellants.

*Geoffrey H. Hand* and *Elizabeth H. Catlin* of *Dunkiel Saunders Elliott Raubvogel & Hand PLLC*, Burlington, for Appellee Green Mountain Power, Inc.

*William H. Sorrell*, Attorney General, and *Gavin J. Boyles*, Assistant Attorney General, Montpelier, for Appellee Agency of Natural Resources.

¶ 1. **Dooley, J.** Appellants Energize Vermont, Inc. and several individuals challenge the Vermont Public Service Board (PSB)'s affirmance of a permit issued by the Agency of Natural Resources (ANR), approving an operational-phase stormwater management plan for appellee Green Mountain Power (GMP), with respect to the Kingdom Community Wind Project (Wind Project) on Lowell Mountain in Lowell, Vermont. Although appellants raised a variety of challenges to the operational-phase permit, as well as other permits, on appeal to the PSB, the only issue maintained on appeal to this Court is the narrow one of whether ANR complied with certain requirements of its own Vermont Stormwater Management Manual (VSMM) in granting the operational-phase permit. We affirm.

¶ 2. The facts of this case are undisputed. The Wind Project is a wind-powered electric generation facility involving twenty-one wind turbines, along with access roads, a substation, an operations building, and power lines. Because the project contains over twenty-seven acres of impervious surfaces, GMP is required to maintain a permit from ANR to regulate management of its stormwater runoff as long as the project is operational. 10 V.S.A. § 1264(a)(11). In granting the permit, ANR is required to ensure that the permit is "consistent with, at a minimum, the 2002 Stormwater Management Manual [VSMM]." *Id.* § 1264(e)(1).

¶ 3. The VSMM contains regulatory requirements for stormwater treatment practices, known as STPs, which are designed to manage stormwater runoff. Because the parties' arguments rely in large part on the language of the VSMM, we describe the VSMM in detail here. The VSMM is divided into three sections. Section 1 is titled "Stormwater Treatment Practice Sizing Criteria." It sets out five distinct "treatment standards" for water quality, channel protection, groundwater recharge, overbank flood protection, and extreme flood protection. This appeal concerns only the Wind Project's compliance with the channel protection treatment standard.

¶ 4. Subsection 1.1.2 sets forth the standards for channel protection treatment. It begins: "To protect stream channels from degradation, storage of the channel protection volume (CPv) shall

be provided by means of 12 to 24 hours of extended detention storage (ED) for the one-year, 24-hour rainfall event." The subsection provides a bulleted list of criteria that "shall be applied" to evaluate channel protection volume and STPs for channel protection. The final bullet in this list states, "For projects that have disconnected the majority of impervious surfaces per use of the credits in Section 3 such that routing to a detention facility is not achieved, the designer may use an alternative design standard." Section 3 of the VSMM addresses "Voluntary Stormwater Management Credits," which the parties agree GMP did not use. Subsection 1.1.2 further contemplates that the "treatment standard for channel protection shall be waived" for several situations which also do not apply to the present case. These are the only places in which subsection 1.1.2 explicitly contemplates exceptions to the channel protection standards it contains. The Wind Project's STP does not conform to the default channel protection standards contained in subsection 1.1.2 because it does not use extended detention storage.

¶ 5. Section 2 of the VSMM is titled "Acceptable Stormwater Treatment Practices." Subsection 2.1 is also titled "Acceptable STPs" and states: "This section outlines STPs that can be used to meet the . . . treatment standards set forth in section 1. These acceptable STPs can be used alone, or in combination, to meet the required treatment standards." VSMM 2.1. The Wind Project has not used an "acceptable STP" as defined by subsection 2.1.

¶ 6. Subsection 2.5 is titled "Alternative STP Designs." It states:

> The stormwater treatment field is rapidly evolving and new stormwater management technologies constantly emerge. A permit applicant may propose and [ANR] may allow the use of STPs other than those listed [above] if the permit applicant can demonstrate to [ANR]'s satisfaction that the proposed alternative STPs will attain the applicable treatment performance standards for [the five treatment standards contained in VSMM Section 1]. **Proposals for use of alternative treatment systems will require consideration of the design through the use of the individual permit application process.**
>
> There are two methods by which a designer may propose an alternative system design evaluation: through consideration of an existing-alternative system . . . ; or

through a new design-alternative system proposed for use in Vermont.

Subsections 2.5.1 and 2.5.2 pertain to "Existing Alternative Systems" and "New-Design Alternative Systems," respectively. The parties agree that the Wind Project's stormwater treatment practices make up a "new-design alternative system," not an "existing alternative system."

¶ 7. Subsection 2.5.2 states:

> The performance standard for STPs shall meet the applicable treatment standards specified in section 1.1, and shall have the capability to achieve long-term performance in the field. For an alternative STP to be submitted to [ANR] for consideration, a designer's certification of compliance, including pertinent design information must be provided. This certification must provide details, with a reasonable level of surety, on how the system will achieve the requisite performance standards.

> . . . .

> If a proposed alternative STP design is successfully approved by [ANR], then this alternative will be available for use by other permit applicants, if determined appropriate by [ANR].

¶ 8. The Wind Project uses an STP known as "level spreaders." The level spreaders function by collecting stormwater in a trough and then dispersing the water across a level edge, through a vegetated buffer. Level spreaders are not specifically referenced in the VSMM. Level spreaders do not meet the default requirements, under subsection 1.1.2, for channel protection because they do not use "extended detention storage." Rather, as described by the PSB, "A level spreader is a constructed feature which is used to convert concentrated runoff to sheet flow and release it in a non-erosive manner across a slope. Vegetated buffers are defined as the land areas immediately downslope of the level spreader which provide for the 'disconnection' of runoff from impervious surfaces to undisturbed natural vegetated terrain."

¶ 9. Appellants contend that the language of subsection 1.1.2 mandates the use of extended detention storage unless a project qualifies for an alternative design standard using VSMM section 3 credits. Under appellants' reading, the only way to use an alter-

native design standard to satisfy the channel protection requirement is by using the credits in section 3, which appellees have not done. Appellants argue that to allow ANR to interpret its manual differently would violate the plain meaning of the regulation and therefore would also violate our instruction that "[a]n administrative agency must abide by its regulations as written until it rescinds or amends them. Otherwise, people will not know how to conduct their affairs." *In re Peel Gallery of Fine Arts*, 149 Vt. 348, 351, 543 A.2d 695, 697 (1988) (citation omitted). Appellants further argue that ANR may deviate from appellants' reading of the VSMM only if ANR amends the VSMM explicitly. For this proposition, they rely upon this Court's decision in *Conservation Law Foundation v. Burke*. 162 Vt. 115, 121, 645 A.2d 495, 499 (1993) ("If the Agency wishes to include an additional de minimis exception, it must do so explicitly.").

¶ 10. This appeal first went to the PSB pursuant to 10 V.S.A. § 8506. Review in the PSB was de novo, although the Board is required to apply "the substantive standards that were applicable before the secretary." *Id.* § 8506(e).

¶ 11. The PSB rejected appellants' argument. In keeping with the statutory standard of review, it gave no deference to ANR's permit decision. It did, however, defer to ANR's construction of its regulation, adopting a "compelling indication of error" review standard from *In re Electronic Industries Alliance*, 2005 VT 111, ¶ 7, 179 Vt. 539, 889 A.2d 729 (mem.).

¶ 12. The PSB rejected appellants' argument for two main reasons. First, it held that section 1.1.2 of the VSMM does not have the meaning appellants attributed to it:

> significantly . . . the limiting word 'only' does not appear anywhere in Section 1.1.2, nor do we read this language to compel that the word 'only' was intended to be read into Section 1.1.2. Rather, we read Section 1.1.2 to simply state expressly that in the case of disconnected projects using Section 3 credits, the Alternative Design Standard may be used.

¶ 13. Second, it ruled that

> the Legislature intended only for stormwater discharge permits to be 'consistent' with the VSMM, as opposed to requiring strict compliance or conformity. The Vermont Stormwater Management Rule similarly states that per-

mits shall be 'consistent' with the VSMM's treatment standards. Therefore, ANR has discretion to tailor an individual stormwater permit to achieve its intended purpose of protecting water quality so long as such permit is consistent with the VSMM and meets the other statutory criteria for discharge permits.

¶ 14. In conclusion, it held that ANR's interpretation of the VSMM to allow use of the Alternative Design Standard in this case was not erroneous. It explained that the "narrow reading sought by Appellants would lead to an irrational result in this case because it would require GMP to install structural STPs where they are not necessary to protect water quality, while causing additional environmental impacts through increased clearing." It therefore concluded that appellants failed to demonstrate that ANR's interpretation amounted to compelling error.

¶ 15. ■ ■ In commencing our own review, we must first determine the standard of review that applies in appeals from the PSB sitting in its appellate capacity.* As all parties noted, we generally give substantial deference to an agency's interpretation of its own regulations — in this case, ANR's interpretation of the VSMM. *In re Peel Gallery of Fine Arts*, 149 Vt. at 351, 543 A.2d at 697. "Absent a clear and convincing showing to the contrary, decisions made within the expertise of such agencies are presumed correct, valid and reasonable." *In re Johnston*, 145 Vt. 318, 322, 488 A.2d 750, 752 (1985). Interpretation of the VSMM is squarely within ANR's expertise as its authoring agency. This deferential standard remains on appeal, even after the PSB holds a de novo hearing on the matter.

¶ 16. ■ In *Town of Killington v. Department of Taxes*, we deferred to the administrative decision of the Commissioner of Taxes even after a de novo trial in the superior court. 2003 VT 88, ¶ 5, 176 Vt. 70, 838 A.2d 91. We did so in part because of the "substantial deference that courts have traditionally accorded

---

* This is the first appeal from another agency heard by the PSB pursuant to 10 V.S.A. § 8506. In appeals from the PSB's decisions made within its original jurisdiction, we "accept as true all of the [PSB]'s findings that are not clearly erroneous, and, in reviewing the [PSB]'s conclusions, we defer to its particular expertise and informed judgment." *In re Cent. Vt. Pub. Serv. Corp.*, 2006 VT 70, ¶ 3, 180 Vt. 563, 905 A.2d 616 (mem.). This case, however, concerns an appeal from the PSB within its appellate capacity and not within its original jurisdiction.

administrative agencies, particularly where, as here, a decision involves highly complicated . . . methodologies within the agency's area of expertise." *Id.* We also did so because this deference was "mirror[ed]" by a statutory provision granting significant discretion to the Commissioner. *Id.* Like *Town of Killington*, this case involves complicated methodologies within an agency's expertise. Also like *Town of Killington*, the statutory authorization for the permitting program delegates discretion to the implementing agency. See 10 V.S.A. § 1264(e)(1) ("The Secretary *may* issue . . . discharge permits for regulated stormwater runoff, *as necessary* to assure achievement of the goals of the program and compliance with . . . law . . . . The permit shall contain additional conditions, requirements, and restrictions *as the Secretary deems necessary* . . . ." (emphases added)). A separate statute requires that the PSB apply the "substantive standards" used by the secretary of ANR. 10 V.S.A. § 8506(e).

¶ 17. ▮ Like the PSB, we accord substantial deference to ANR's interpretation of the VSMM. As this is the same standard used by the PSB, we thus review the PSB's decision de novo. *Travia's Inc. v. State*, 2013 VT 62, ¶ 12, 194 Vt. 585, 86 A.3d 394 ("Where there is an intermediate level of appeal from an administrative body, this Court reviews the case under the same standard as applied in the intermediate appeal."). Appellants therefore bear the burden of showing that ANR's interpretation is "wholly irrational and unreasonable in relation to its intended purpose." *Town of Killington*, 2003 VT 88, ¶ 6.

¶ 18. ▮ We are not persuaded that ANR's interpretation of the VSMM is irrational or unreasonable in relation to its intended purpose. We agree with the PSB that the plain meaning of the regulation does not support appellants' argument. Appellants' argument rests on an extremely narrow interpretation of subsection 1.1.2 which we decline to follow, particularly in light of the intended purpose of the VSMM. Appellants point to the provision of subsection 1.1.2 that reads: "For projects that have disconnected the majority of impervious surfaces per use of the credits in Section 3 such that routing to a detention facility is not achieved, the designer may use an alternative design standard." Appellants read this provision as though it begins with the word "only." As stated in their brief: " 'Per the use of the credits in Section 3' means that the *only* time an alternative design standard

may be used to evaluate an STP's compliance with the Channel Protection Treatment Standard is when a project has . . . utiliz[ed] the credits in Section 3 of the VSMM." (Emphasis added.) In fact, appellants have added this restrictive gloss themselves. Appellants' addition of the word "only" to subsection 1.1.2 is not a "clear and convincing" showing that ANR's contrary interpretation is in error.

¶ 19. ▨ Given the deferential standard of review, this straight-forward plain meaning analysis needs little elaboration. Appellants have not met their burden. We note, however, that our analysis is fortified by looking to the VSMM as a whole and the intent of the drafters. See *Burke*, 162 Vt. at 121, 645 A.2d at 499 (stating that we interpret regulations as a whole and look to the intent of the drafters to aid in our interpretation); *In re Verburg*, 159 Vt. 161, 164, 616 A.2d 237, 239 (1992) (stating that we rely on the intent of the drafters in interpreting regulations or statutes).

¶ 20. ▨ Reading the VSMM as a whole reinforces our under-standing that this provision — allowing use of section 3 credits as a means of achieving a successful alternative design standard for purposes of the channel protection requirement—does not neces-sarily preclude other means of reaching the same end. Subsection 2.5, entitled "Alternative STP Designs," begins by acknowledging that the "stormwater treatment field is rapidly evolving and new stormwater management technologies constantly emerge." The clear implication of this preface is that ANR aims to be responsive to the need to evaluate new technologies as they arise and will not be bound by obsolete measures. The subsection continues, "the Agency may allow the use of [alternative] STPs . . . if the permit applicant can demonstrate to the Agency's satisfaction that the proposed alternative STPs will attain the *applicable* treatment performance standards for water quality, groundwater recharge, channel protection, overbank flood protection and extreme flood control." (Emphasis added.) The key word here is "applicable," a word which is used in the same fashion in subsection 2.5.2, entitled "New-Design Alternative Systems." That subsection re-quires only that alternative STPs "meet the *applicable* treatment standards specified in section 1.1." (Emphasis added.) Given the cross-reference to subsection 1.1 generally, the subsection 1.1.2 default standard of extended detention storage for channel pro-tection may not be an "applicable" standard for the alternative-

design level spreader STP, because level spreaders use other means of protecting stream channels from degradation—namely dispersion and buffering.

¶ 21. ■ This is not to say that new-design alternative systems are standardless. The VSMM has a more flexible, individualized system of evaluation for new-design alternatives. Subsection 2.5 states, in bold: "Proposals for use of alternative treatment systems will require consideration of the design through the use of the individual permit application process." This is in contrast with the general permit application process, which involves less scrutiny from ANR at the individual project level. 10 V.S.A. § 1264(e)(2) (providing for general stormwater permits that can be issued to a category of projects). For new-design alternative systems, the VSMM additionally requires a detailed plan of study regarding the project's actual stormwater impact to be completed within three years of the project's construction. If ANR finds the results of the study to be unsatisfactory, it can require the project to be rebuilt using acceptable STPs. All of these provisions, read as a whole, show that the VSMM is designed to allow flexibility for the evaluation and implementation of new technologies.

¶ 22. This interpretation is further supported by the legislative intent behind the stormwater permitting program. The statutory directives for the program state that stormwater management should use "structural treatment only when necessary"; that management strategies should be "tailor[ed] . . . to the region and the locale"; and that the permitting process should "provide[ ] for the evaluation and appropriate evolution of programs." 10 V.S.A. § 1264(a). The narrow reading advocated by appellants would be contrary to this intent because it would require GMP to install extended detention storage where not environmentally necessary; to use strategies not tailored to the locale; and to cause the permitting program to adhere to rigid requirements rather than evolve. Notably, although GMP states that the level spreaders are fully installed and operational, appellants have abandoned on appeal any arguments that the level spreaders are environmentally inferior to other STP designs.

¶ 23. In sum, we find no clear and convincing error in ANR's interpretation of the VSMM to allow an operational stormwater permit for the Wind Project's level spreaders.

*Affirmed.*