Reiber, C.J.
¶ 1. This appeal concerns a timber harvest by landowner Plum Creek Maine Timberlands, LLC in forestland enrolled in the current-use, tax-incentive program. The Vermont Department of Forests, Parks and Recreation (FPR) issued an adverse inspection report, concluding that Plum Creek violated its forest-management plan and failed to comply with minimum acceptable standards during the harvest. Consequently, the Department of Taxes removed the land from the current-use program and levied a tax assessment. Following Plum Creek’s appeal, the superior court reversed those administrative decisions. FPR now appeals, arguing that the superior court failed to give appropriate deference to FPR’s determination of the proper methodology for measuring compliance with the forest-management plan. We reverse the court’s decision, and remand.
¶ 2. The property in question consists of approximately 56,600 acres in northeastern Vermont. Formerly part of the Champion International Corporation holdings, the land was sold in 1998 to the Essex Timber Company. Essex Timber enrolled it in the Use Value Appraisal (UVA), or current-use, program. This tax-incentive program was designed to “encourage and assist the maintenance of Vermont’s productive agricultural and forestland” by taxing property enrolled in the program at its “current use” value rather than its fair market value. 82 V.S.A. §§ 8751, 8756(a). To be eligible for the program, forestland must be “under active long-term forest management ... in accordance with minimum acceptable *200 standards for forest management.” Id. § 3752(9)(A). “Minimum acceptable standards for forest management” are defined as standards set by FPR. Id. § 3752(13). Eligibility also generally requires compliance with “the regulations adopted by the [Current Use Advisory] Board.” Id. § 3755(a). The UVA Program Manual adopted by the Board[1] sets forth minimum standards for forest-management plans, minimum standards for forest management and regeneration, standard forms for use by landowners enrolled in the program, and appendices containing additional guidance for foresters and landowners.
¶ 3. To enroll in the UVA program, a landowner must file a “forest management plan” and obtain the approval of FPR, which is tasked with periodically reviewing the plan and inspecting each enrolled parcel. Id. § 3755(c). If upon inspection FPR “finds that the management of the tract is contrary to the . . . forest management plan, or contrary to the minimum acceptable standards for . . . forest management,” it is required to file an “adverse inspection report” with the landowner and the PVR Director. Id. When a report is filed, the PVR Director, in turn, is required to “remove from use value appraisal an entire parcel of managed forestland and notify the owner.” Id. § 3756(i)(1). This appeal involves FPR’s issuance of such an adverse-inspection report to Plum Creek.
I. Facts
¶ 4. Essex Timber prepared a forest-management plan, which FPR approved in 2007. See 32 V.S.A. § 3755(b), (b)(1) (providing that “[mjanaged forestland” must be “subject to a forest management plan” to be eligible for enrollment in UVA program). The following year, Essex Timber sold its holdings to Plum Creek, which formally adopted the existing management plan.
¶ 5. Under a strategy developed by FPR to accommodate large landowners, Plum Creek’s forest-management plan provided more conceptual, and less stand-specific, information than is generally *201 required by FPR for participation in the UVA program. When an actual timber harvest is planned, however, the landowner must submit a “harvest prescription amendment” to the management plan containing more detailed information, and obtain the approval of the county forester for this amendment.
¶ 6. In 2009, Plum Creek sought to harvest timber for six stands in its managed forestland and worked with the county forester for Caledonia and Essex Counties to adopt a prescription amendment to its management plan. The plan set both numerical and qualitative goals for each stand to be harvested. Those goals were memorialized in a prescription amendment. For the three stands at issue in this appeal, the prescription provided the following. Stand 34 was to receive a two-staged shelterwood[2] and the target residual basal area (RBA) — the amount of tree stock left after cutting — was set at 30-40 ft[2]. Stand 43 also was to receive a two-staged shelterwood cut and some overstory removal and the target RBA was 60 ft[2]. Stand 44 was to receive intermediate thinning with a target RBA of 60 ft[2].
¶ 7. In late January 2010, after cutting had begun, the county forester visited the site with several other individuals including Plum Creek’s forester, an FPR forester, and a forester from the Vermont Land Trust to review the harvest’s progress. The county forester expressed concern about the level of cutting in Stand 34. Trees, which had been marked for retention, had been cut, and this sight “raised alarm with everyone as it suggested excessive cutting in disregard of the prescription.” Based on the observations of cutting, all, including Plum Creek’s forester, were concerned about the level of cutting and whether the proper outcome could be met if logging continued. The county forester also observed several violations of the Acceptable Management Practices (AMPs), which are designed to protect water quality during logging operations. The AMPs violations included the siting of equipment too close to water, improper stream crossings, and mud and sediment where equipment had crossed a stream. In response, Plum Creek’s forester went to the home of the contracted logger and stopped all cutting in Stand 34. Subsequently, Plum Creek worked to correct the AMPs violations by removing the crossings and remediating the sites deemed to be contrary to the AMPs.
*202 ¶ 8. In early February 2010, Plum Creek suspended the entire harvest pending further investigation. Later that month, the county forester visited the site again with two other state officials: FPR’s forester in charge of AMPs compliance and the Agency of Natural Resources (ANR) officer for AMPs enforcement. In a letter to Plum Creek written shortly thereafter, the FPR forester identified several additional AMPs violations involving erosion controls, logging debris, stream crossings, seeding and mulching, and protective strips along streams. The letter detailed the necessary remediation measures and closed with the observation that FPR’s intentions were to ensure remediation in a timely manner and to educate Plum Creek’s logging operators so that they could “implement proper practices in the future.”
¶ 9. In the course of additional site visits in March and April 2010, the county forester measured the RBA in the harvested portions of the stands. The county forester issued an adverse-inspection report identifying violations in Stands 34, 43, and 44 consisting of “cutting contrary to the approved forest management plan,” as well as practices contrary to the AMPs. His cut contrary finding was based on the following measurements. The county forester calculated that the RBA for 91 harvested acres of the 137 acres in Stand 34 was 19.7 ft2, well below the prescription level of 30 to 40 ft2. He determined that the RBA for 40 harvested acres in Stand 43 was 23.3 ft2, below the prescription target RBA of 60 ft2, and that the regeneration goal was not met with only 15% of the plots stocked. In Stand 43, the county forester also found that the harvest had failed to meet the prescription’s tree-regeneration goal, which called for a “Two Staged Shelterwood . . . and Overstory Removal (OSR)” with the goal of “releasfing] quality growing stock and providfing] gaps to promote regeneration.” The county forester determined that the RBA for the 8 harvested acres in Stand 44 (out of a total of 37) was 16.3 ft2, again below the prescription’s target level of 60 ft2.
¶ 10. Related to the AMPs violations, FPR’s forester for AMPs compliance sent a letter to Plum Creek confirming that he had inspected the sites of the previously identified AMPs violations and had “observed that all of the major remedial actions relating to the AMPs violations have been accomplished” and that Plum Creek was now in compliance with the AMPs.
¶ 11. In May 2010, FPR informed Plum Creek that it had forwarded the county forester’s report to PVR, see 3 V.S.A. *203 § 2289(a), with the recommendation “that the property be removed from UVA for harvesting contrary to the management plan.” In July 2010, PVR notified Plum Creek that, based on the adverse-inspection report, its “entire parcel” had been removed from the UVA program. Plum Creek appealed that decision to the PVR Director pursuant to 32 V.S.A. § 3758(a),[3] contesting removal of the entire 56,604-acre tract from the program rather than the 470 acres that comprised the harvest area. Plum Creek also appealed the adverse-inspection report to the Commissioner of FPR pursuant to 32 V.S.A. § 3758(d).
¶ 12. The FPR Commissioner provided an informal hearing at which no evidence was taken and of which there is no transcript or audio recording.[4] Plum Creek provided “remarks” by its lawyer and two employees and also sent a written argument. Apparently, the county forester also was present, although it is not clear that he provided any information in the presence of the Plum Creek representatives.
¶ 13. The FPR Commissioner upheld the adverse-inspection report, concluding that the cutting was contrary to the forest-management plan. The Commissioner examined the evidence supplied by the county forester and concluded that both the evidence and the methodology were sound. The Commissioner found that the data were collected appropriately and compliance was measured according to the correct methodology. Plum Creek argued that there were no grounds for the violation because harvesting was suspended before the entire stand was cut. Plum Creek proffered that if cutting had continued, then the final RBA for the entire stand could have been in compliance. In the alternative, Plum *204 Creek asserted that if RBA was measured by averaging the treated and untreated areas of the stands, it would meet the plan goals.
¶ 14. The Commissioner rejected these arguments. The Commissioner explained that it was not necessary to wait for the entire stand to be cut before bringing a violation and that if only a portion of the stand was cut, then compliance should be measured by focusing on the harvested area. The Commissioner acknowledged that the stand is the typical unit for measuring RBA, but explained that focusing on the cut area of the stand was in keeping with forestry practices. After a portion of the stand was cut, this effectively created a new stand because the treated and untreated portions had different distribution, composition, and structure, and therefore the Commissioner concluded that it was appropriate to evaluate them separately. The Commissioner clarified that compliance with the prescription amendment was assessed by looking at the qualitative attributes of the parcel and not just by measuring stocking levels. Therefore, it would make no sense to include the uncut portions of the stand in measuring compliance because the goals of the prescription could not be met in the untreated portion of the stand. For example, in Stand 34, a shelterwood cut was prescribed. This was obviously not achieved in the uncut area where no harvesting occurred. Further, the Commissioner found that the goal was not achieved in the cut area where the RBA of 19.7 was essentially a commercial clear cut. The Commissioner rejected Plum Creek’s assertion that these two could be averaged to achieve a numerical RBA that would be within the prescription goal. The Commissioner also upheld the AMPs violations, noting that they were observed in the field by all parties.
¶ 15. The FPR decision was reported to the Department of Taxes. In March 2011, the PVR Director issued a decision on Plum Creek’s appeal, upholding the decision to remove Plum Creek’s entire parcel of 56,604 acres from the UVA program, and levying an assessment of a land-use change tax in the amount of $7,860.80.
¶ 16. Pursuant to 32 V.S.A. § 3758(a) and (d), Plum Creek appealed both administrative rulings to the superior court, which consolidated them for review.[5] Following pretrial briefing, the *205 court held an evidentiary hearing over the course of several days in May and June 2013.
¶ 17. Plum Creek presented testimony from a forestry expert, Mr. Holleran, who testified that the cutting was in compliance with the prescription amendment. Mr. Holleran is a forester, who had assisted landowners in managing land that is in the UVA program, but who had no prior involvement in the management of Plum Creek’s land and acknowledged at trial that he had never prepared a forest-management plan for a large landowner similar to the type of plan used by Plum Creek. Mr. Holleran presented evidence to advance the same argument Plum Creek made before the Commissioner — that RBA targets were achieved if the RBA was measured across both the treated and untreated portions of each stand. He testified that this was the appropriate calculation because the stand was the accepted unit of measure for RBA compliance. He submitted four written analyses of the harvest based upon several site visits in the fall of 2011 and 2012, and also testified at length in support of his conclusion that the harvest was in compliance with the amended management plan and forest-management standards.
¶ 18. The county forester also testified and described his sampling method. He explained that the cut areas were not in compliance with the forest-management plan either quantitatively — because the measurements of RBA were well below the targets set, or qualitatively — because the observation of the regrowth and condition of the stand did not meet the expectations in the prescription.
¶ 19. The court issued a written decision in January 2014. As to the compliance with the forest-management plan, the trial court framed the issue as an evidentiary question. The court explained that measuring RBA was not within the exclusive expertise of FPR because it is something that foresters do all the time; therefore, the court determined it was free to decide the relative credibility of each expert’s method for how to measure RBA when only part of the stand had been harvested. The court stated that the county forester’s methodology “was not incorrect” and was consistent with “manual standards.” Nonetheless, the court found that Plum Creek’s expert provided superior evidence, which was more credible than the state forester’s. The court thus adopted Plum Creek’s expert’s view that RBA should be measured across the entire stand and found, based on that expert’s calculations of *206 RBA in those areas, that the harvest was in compliance with the forest-management plan. Consequently, the court concluded that the adverse-inspection report was not justified on this basis.
¶ 20. The court further found that, although several AMPs violations were identified immediately after the harvest, they were promptly remediated to the satisfaction of the FPR forester responsible for AMPs compliance, and that there was no evidence of any residual harmful effect on water quality. The court noted, “There is no evidence that there was anything more than a few temporary violations of the sort not uncommon in logging operations.” The court concluded that the adverse-inspection report was not warranted based on these AMPs violations.
¶ 21. Because the decision by PVR to remove the tract from the UVA program was predicated on the adverse-inspection report, the court concluded that the Tax Department’s ruling must be reversed as well. This appeal by the State followed.
II. Standard of Review
¶22. The State first contends the superior court erred by failing to accord sufficient deference to the methodology adopted by FPR to determine compliance with the forest-management plan. As a threshold matter, therefore, we consider whether the court applied the correct standard of review. The question of the appropriate standard of review is a legal one that we consider de novo. In re Soon Kwon, 2011 VT 26, ¶ 5, 189 Vt. 598, 19 A.3d 139 (mem.).
¶ 23. The UVA statute provides that an appeal from FPR’s decision to the superior court is to be in “the same manner and under the same procedures” as a property tax appeal. 32 V.S.A. § 3758(d). Those appeals are filed pursuant to Rule of Civil Procedure 74,[6] and are de novo. 32 V.S.A. §§ 4461(a), 4467.[7]
*207 ¶ 24. This Court established the proper standard of review for appeals to the superior court from an FPR current-use decision in Jones v. Department of Forest, Parks & Recreation, 2004 VT 49, 177 Vt. 81, 857 A.2d 271. In that case, we explained that factual findings are reviewed for “clear error,” but “substantial deference” is given to FPR’s determinations within its “area of expertise.” Id. ¶ 7. Thus, FPR’s decision as to a violation should be upheld unless “the Department’s finding of a violation . . . was standardless, unsupported by the evidence, or contrary to law.” Id. ¶ 14.
¶ 25. The basic framework for the standard of review is not altered simply because in this case there was a de novo evidentiary hearing in the superior court. Because the superior court has conducted a de novo hearing, as factfinder, the court’s factual findings are reviewed for clear error. As to questions of policy, however, agency determinations regarding the proper interpretation of policy or methodology within the agency’s expertise are entitled to deference, even where there is a de novo hearing in the superior court. ANR Permits, 2014 VT 50, ¶¶ 15-16. “[D]eci-sions made within the expertise of such agencies are presumed correct, valid and reasonable.” Id. ¶ 15 (quotation omitted).
¶ 26. The critical inquiry is in determining whether an issue involves a question of fact, subject to the superior court’s discretion as factfinder, or whether it is a matter of policy or methodology within the agency’s area of expertise. Four major issues with respect to timber harvesting were contested before the superior court: (1) whether compliance should be measured across the stand as a whole or over only the cut-specific areas; (2) the numerical RBA measurements in the substand areas; (3) whether *208 tree-regeneration measurements should be taken three years after the harvest or immediately after the harvest; and (4) whether a box on a map of Stand 43, labeled “OSR” for overstory removal, meant that OSR could occur only in the box area.
¶ 27. We need not go beyond the first issue to resolve this appeal because although the experts’ calculations of RBA in the harvested portions of the stands differed, both measured the RBA in those areas below the target levels. The measurements of the two experts are summarized in the following chart:

Thus, the main difference in their opinions of whether a violation occurred was the proper methodology for calculating RBA. Plum Creek’s expert testified that the stand was the unit of measurement and therefore RBA should be measured across the entire stand, regardless of whether the entire stand had been harvested. In keeping with the methodology adopted by the FPR Commissioner, the county forester measured RBA by looking solely at the harvested area of each stand.
¶ 28. The superior court viewed the question of how RBA should be measured for purposes of determining compliance with the forest-management plan as a question of fact, not an area of agency expertise entitled to deference, and compared the relative credibility of the experts to determine how to measure compliance. As explained more fully below, this was error. FPR’s decision on the methodology for determining compliance was entitled to deference, and Plum Creek had the burden to show it was “ ‘wholly irrational and unreasonable in relation to its intended purpose.’ ” ANR Permits, 2014 VT 50, ¶ 17 (quoting Town of Killington, 2003 VT 88, ¶ 6).
*209 ¶ 29. Like other cases where this Court has applied a deferential standard of review to an agency decision, in this case, deference is due because the methodology for determining compliance is an area over which FPR has broad statutory authority and the relevant expertise. See id. ¶ 16 (explaining that agency is entitled to deference where decision is within agency’s area of expertise and within statutory authorization); In re Williston Inn Grp., 2008 VT 47, ¶ 13, 183 Vt. 621, 949 A.2d 1073 (mem.) (explaining that where Legislature entrusts implementation of statute to agency, this Court gives deference to agency’s interpretation of those laws). The statutory scheme underpinning the current-use program contains the standards to be applied to all UVA-enrolled land and highlights the importance of oversight by FPR. FPR is entrusted with the authority both to set standards for acceptable forest management and to enforce compliance with those standards. See 82 V.S.A. § 3752(9)(B)(iii) (defining “managed forestland” as property that is managed in accordance with standards established by FPR); id. § 3755(c) (entrusting FPR with power to determine if “management of the tract is contrary to the conservation or forest management plan” and to issue inspection report if it so finds). Consequently, FPR is entitled to deference in determining how to measure compliance. This is exactly what this Court recognized in Jones, 2004 VT 49, ¶ 14 (giving deference to FPR on decision regarding violation of forest-management plan).
¶ 30. The superior court in essence determined that Plum Creek’s methodology was better than FPR’s. This is not the role of the court. “We have cautioned that courts are not ‘a higher environmental agency entrusted with the power to make environmental law and policy,’ but rather exercise a ‘narrow role in ensuring that the decisions of ANR are made in accordance with law.’ ” Id. ¶ 14. Where there are questions about “complicated methodologies within an agency’s expertise” a reviewing court, even in the context of a de novo hearing, must give deference to the agency’s decision. ANR Permits, 2014 VT 50, ¶ 16.
¶ 31. In assessing the validity of FPR’s violation, the trial court and this Court on appeal must give deference to FPR’s methodology. This does not mean that FPR’s decisions will be rubber-stamped, but deference is accorded. “Absent a clear and convincing showing to the contrary, decisions made within the *210 expertise of such agencies are presumed correct, valid and reasonable.” In re Johnston, 145 Vt. 318, 322, 488 A.2d 750, 752 (1985). Review is limited to whether there was a “reasonable basis” for the agency action. Id.; see In re DeCato Bros., Inc., 149 Vt. 493, 496, 546 A.2d 1354, 1356 (1988) (explaining that agency decision must meet minimum standard of reasonableness).
III. Measurement of Compliance
¶ 32. In light of this standard of review, we turn to the question of whether the Commissioner’s decision on methodology had a reasonable basis sufficient to satisfy review.
¶ 33. The Commissioner provided the following reasons for adopting a policy of determining compliance by limiting the calculation of RBA to the area that had been harvested.[8] The Commissioner acknowledged that the typical unit for forest management is the stand, but concluded that where areas of the stand receive different treatment a new stand may be created. The Commissioner explained:
Although the unit of measure for forest management purposes and UVA is the “stand,” management can alter the unit enough to create different stands. As a “stand” is a contiguous group of trees sufficiently uniform in age-class distribution, composition and structure, and growing on a site of sufficiently uniform quality, to be a distinguishable unit, the harvesting in stand 34 has *211 created two separate stands as that area harvested has a very different age-class distribution, composition and structure now compared to that area left untreated. They are no longer the same stand; therefore, they should be sampled and evaluated separately.
In other words, because part of the stand had been cut while the remaining acres were left untouched after cutting was halted, the Commissioner determined that the cut areas should no longer be considered part of the existing larger stand and should be evaluated separately from the uncut areas.
¶ 34. Moreover, the Commissioner explained that averaging the basal area of the logged and unlogged portions did not portray an accurate picture of whether the goals and objectives of the prescription were met. This assessment is well illustrated by Stand 34, for which the prescription called for a shelterwood cut to target sugar maple and yellow birch with large crowns for retention, and set a target RBA of thirty to forty. The Commissioner explained that the purpose of the cut was to create the correct light levels and soil moisture on the ground to promote seed germination and seedling establishment. The Commissioner explained just looking at an average of the stocking level across the untreated and treated portions of the stand produced an inaccurate picture of whether this goal was met. As the Commissioner stated, “The notion that the goals and objectives of the shelterwood treatment were met by considering shade from trees over a kilometer away (in the uncut portion of the stand) as providing the necessary microenvironmental condition is a misapplication and a complete misunderstanding of the principle of the silvicultural practice.”[9]
*212 ¶ 35. We conclude that the Commissioner’s decision to determine violations by measuring compliance, both quantitatively and qualitatively, solely in the cut area of the stand was reasonable, and not “standardless, unsupported by the evidence, or contrary to law.” Jones, 2004 VT 49, ¶ 14.
¶ 36. First, it is a method that promotes the overall policy of the UVA program, which is to maintain productive forestland and to prevent accelerated use. 32 V.S.A. § 3751. If RBA for purposes of compliance could be measured by averaging harvested and unharvested portions of a stand, then cutting, which offends the protection and proper use purposes, could not be prevented because it could still technically comply with numerical prescribed RBA targets. For example, if a prescription provides for a shelterwood cut and sets a moderate RBA target, then the target RBA could be met by clear cutting half of the stand and leaving the other half fully forested and untreated. While numerically this would meet the prescribed RBA under Plum Creek’s methodology, it certainly would not protect forestland or prevent accelerated use. Id. It also would not achieve the qualitative goals of the shelterwood prescription necessary for the desired tree growth.
¶ 37. Second, restricting measurement to areas already harvested is logical. RBA is a measure of the residual basal area in a stand, which by definition refers to the basal area left after harvest. It is simply not logical to purport to measure RBA in an untreated, unharvested area.
¶ 38. Third, measuring compliance in the cut areas allows for more effective oversight by FPR. If a violation cannot be based solely on observations and measurements taken in the portion of the stand already harvested, then FPR will have to wait for an entire stand to be cut contrary before bringing a violation. For large stands, this could have drastic consequences. Plum Creek’s expert recognized in this case that if the harvest in Stand 34 had continued in the rest of the stand in the same manner, the entire stand would have been out of compliance. Surely, FPR was not required to wait for those additional forty acres to be clear cut before bringing a violation.[10]
¶ 39. Fourth, it is a method consistently used. As the Commissioner noted, this is how other violations have been calculated. *213 Indeed, it is wholly in keeping with our decision in Jonss, in which this Court determined that FPR acted within its discretion in limiting its analysis of whether a violation occurred to the portion of the stand that was cut. 2004 VT 49, ¶ 13.
¶ 40. There is no merit to the trial court’s concern that because basal area is generally measured across a stand, a landowner would not be on notice that a violation could be brought for overcutting in one area of the stand. The landowner is on notice that the harvest prescription must be met — both qualitatively and quantitatively — across the entire stand. Further, as demonstrated by Jones and the record in this case, FPR has previously determined compliance by measuring RBA solely in cut portions of the stand.
¶ 41. Plum Creek failed to demonstrate that the Commissioner’s methodology was “wholly irrational and unreasonable in relation to [the UVA statute’s] intended purpose.” ANR Permits, 2014 VT 50, ¶ 17 (quotation omitted). Plum Creek’s expert’s explanation for why he took the measurement across the entire stand was simply that “the stand is the unit of measure for forest management.” He did not provide an explanation of why this was appropriate for a stand that had been only partially treated. He did not provide a clear answer as to whether a landowner could be in compliance with a forest-management plan by clearcutting half of a stand and leaving half of the stand untouched to reach a particular numerical RBA average. In fact, he failed to explain how he could be assured that once cutting was resumed in the areas not yet cut that the stand would still be in compliance with the prescription.
¶ 42. For example, he testified that if the remaining uncut portion of Stand 34 was harvested to a density of 60, then even taking the county forester’s measurement of 19.7 for the cut portion, the entire stand would still be within the prescription of 30 to 40 RBA. There was no assurance, however, that such density would be achieved in the remaining portion and there was no evidence that cutting the remaining portion of Stand 34 to a density of 60 would achieve the goals of the prescription by creating the necessary microclimate conditions on the ground. In response to the question of whether two stands had been created by the cutting, Plum Creek’s expert answered “that’s a complicated question.” He acknowledged that that could happen, but felt that for evaluating the prescription, the measurement should be made for the entire stand. While this may be true if the entire *214 stand had received the same treatment, FPR provided reasonable and logical reasons why RBA should be calculated based solely on the part of the stand that had already been cut.
¶ 43. Further, that FPR’s methodology in limiting its assessment to the cut area was a logical and reasonable measurement of whether the prescription plan had been followed was acknowledged by Plum Creek’s expert to some degree. In response to the question of whether the goal of treatment for Stand 44 was met qualitatively, he answered that the prescription was met only in the harvested area. This is logical because obviously the conditions in the uncut areas were unchanged and therefore could not have met the goals of the cut. It also creates, however, an inconsistency in the evaluation method used by Plum Creek’s expert. If the qualitative assessment of whether the forest-management plan was met must be limited to the area cut, then how can the quantitative assessment include the entire stand? FPR’s decision to limit both its qualitative and quantitative assessments to the cut areas was both consistent and reasonable.
¶ 44. Given that both experts calculated the RBA in the cut areas of Stands 34, 43, and 44 below the targets set in the forest-management plan, we conclude that this failure to meet the targets was an adequate basis for issuing the adverse-inspection report, and therefore that the trial court erred in reversing it.
IV. AMPs Violations
¶ 45. In addition to a finding that the stands were cut contrary to the forest-management plan, the adverse-inspection report was also based on findings that Plum Creek failed to implement AMPs. The Commissioner upheld the adverse-inspection report in both respects. The trial court concluded that there was no violation of the forest-management plan and that the AMPs violations were insufficient on their own to justify an adverse-inspection report. The court found that — although “there were [AMPs] violations” — there was “no evidence that [they were] anything more than a few temporary violations of the sort not uncommon in logging operations”; that there was “no evidence” of any residual “detrimental impact on water quality of the type the AMPs are designed to prevent, despite the violations”; and that there was also no evidence of residual “harm to . . . wildlife or soil erosion.” The court noted, in this regard, that the FPR forester overseeing AMPs compliance determined that Plum Creek had *215 remediated the violations within a few months of their discovery, and that the ANR official in charge of AMPs enforcement undertook no enforcement action.
¶ 46. On appeal, the State argues that the superior court’s finding that Plum Creek violated several of the AMPs protecting water quality compelled affirmance of the Commissioner’s decision upholding the adverse-inspection report. Having concluded that the adverse-inspection report was warranted based on Plum Creek’s violations of the forest-management plan, we need not and do not reach the question of whether the AMPs violations would have provided a sufficient independent basis to issue an adverse-inspection report.
V. Conclusion
¶ 47. In sum, we reverse the superior court and reinstate the adverse-inspection report as upheld by the FPR Commissioner. We remand to the superior court to consider the questions raised in Plum Creek’s appeal of the PVR Director’s decision removing land from the UVA program and leveling a tax assessment against Plum Creek.

Reversed and remanded.

 Comprised of the Commissioner of Taxes, the FPR Commissioner, the Director of the Department of Taxes, Division of Property Valuation and Review (PVR), members of the private agricultural and forestry sectors, and local government representatives, 32 V.S.A. § 3753(b), the Board’s legislatively defined duties are to periodically review the criteria for enrollment in the UVA program, recommend changes and improvements, and adopt rules to carry out its statutory goals. Id. § 3754(a), (c).

 A shelterwood cut reduces the basal area to create the particular microclimate conditions necessary to regenerate certain species within the stand.

 As the statute existed in 2010 when the appeal was taken, the aggrieved party appealed from the PVR Director, who formally removed the property from the UVA program, to the same Director. See 2007, No. 190 (Adj. Sess.), § 4. The statute now states that the appeal goes from the PVR Director to the Commissioner of Taxes.

 The statute provides no specificity on how the appeal is to be conducted. While the Vermont Administrative Procedure Act (APA) specifies procedures for many types of administrative proceedings, its regulation is generally applicable only to contested cases, see 3 V.S.A. §§ 809-813, which are defined as proceedings in which “legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing,” id. § 801(a)(2). There is no requirement that the appeal to the Commissioner provided in § 3758(d) be determined after an opportunity for a hearing. Thus, the APA does not apply to the appeal to the Commissioner, and this was an informal adjudication.

 Because the Plum Creek tract lies in both Essex and Orleans counties, there were actually four administrative rulings, two from each county. All of these rulings were consolidated on appeal.

 Rule 74 also specifically provides that the rules of civil procedure “shall govern proceedings” in the superior court. V.R.C.R 74(g). In a departure from Rule 74(e), however, which authorizes trial by jury on “[a]ny question as to which there is a right to trial by jury,” the statute provides that tax appeals to the superior court “shall be heard without a jury.” 32 V.S.A. § 4461(a).

 The dissent claims that the standard of review is misidentified, but the dissent largely agrees with the standard articulated here. Review is de novo in the trial court. We emphasize, as we have done in the past in the context of property tax appeals, that although the appeal is de novo this does not mean that the trial court “ultimately owes no deference to the decision of the administrative agency.” *207 Mollica v. Div. of Prop. Valuation & Review, 2008 VT 60, ¶ 8, 184 Vt. 83, 955 A.2d 1171; see In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶¶ 9-17, 196 Vt. 467, 98 A.3d 16 (explaining that even though review was de novo to public service board, board was still required to defer to agency’s interpretation of matters within its area of expertise). Even in the context of de novo review, a court must still defer to an administrative agency’s interpretation of a matter within its “legislatively delegated expertise.” Mollica, 2008 VT 60, ¶ 9.
The true point of divergence between this decision and the dissent is whether the critical question on appeal is an area within the agency’s expertise to which the trial court must defer or a factual determination for the trial court to decide. Because the key inquiry depends on the “proper methodology for implementing a statute” within the purview of FPR, the agency’s interpretation is accorded deference. See Town of Killington v. Dep't of Taxes, 2003 VT 88, ¶ 5, 176 Vt. 70, 838 A. 2d 91.

 The dissent repeatedly comes back to the fact that cutting was halted partway through and laments that there would be no conflict about how to measure RBA “if the timber harvesting was completed in the three stands.” Post, ¶ 125. Obviously, if cutting had been completed, then the issue of whether to measure RBA in the entire stand or just in the cut portion would not exist. The fact is that cutting did cease. The dissent sees this as an injustice to Plum Creek, and places blame on the State for declaring a violation before the harvest was completed. The dissent accuses the majority of appellate factfinding on the issue. There is no need to engage in appellate factfinding. To the extent that it is relevant, the court made sufficient findings on the issue. The trial court found, based on the evidence presented, that it was Plum Creek’s forester that initially told the logger to cease cutting based on the forester’s own concern about the level of cutting he observed during the site visit in late January. Whether Plum Creek then continued to suspend cutting voluntarily or felt compelled by concerns expressed by ANR and FPR is not relevant. Plum Creek did not claim compliance based on future cutting; rather, it based compliance with the prescription on the fact that the RBA, if averaged between the cut and uncut portions of the stand, was within the goals set.

 The dissent dismisses this concern and asserts that Plum Creek never intended to harvest only part of the stand and its position “has always been that the harvest could not be judged in midstream and should have continued to its end.” Post, ¶ 126. It has not “always” been Plum Creek’s position that the harvest should continue; Plum Creek voluntarily chose to stop the harvest based on an assessment by its own forester that the logger was not following its directions. Further, Plum Creek did not base its alleged compliance with the prescription goals on a continued cutting plan but alleged it complied with the prescription goals if the RBA was calculated by averaging the cut and uncut portions of the stand. Plum Creek’s own expert in the superior court testified that if the entire stand had been cut in the same manner as the already harvested portion, it would have been out of compliance.

 Especially in a situation like this where Plum Creek voluntarily ceased cutting, FPR should not have to wait indefinitely to see if and when the landowner will continue cutting before bringing a violation.