Dooley, J.,
¶ 48. dissenting. On January 15, 2010, the Vermont Department of Forests, Parks and Recreation (FPR) approved logging on land owned by Plum Creek pursuant to a plan drafted and submitted by Plum Creek. Logging apparently proceeded quickly because on January 26, 2010, the staff forester of Plum Creek, the FPR county forester, along with others, visited a harvest of trees on part of Plum Creek’s forestland. The date of the visit was apparently arranged so that all could attend and the logging would be in progress; there was no significance to how much of the harvest had been completed, how much was left to complete or where in the forest the contract loggers were working. The site visit was to three “stands,” defined and mapped out areas of the forest. A majority of the harvest had already occurred on two stands, while only 20% of the area in the third stand had been logged, although this stand was much smaller than the other two. During the site visit the FPR county forester indicated that he believed that the areas he saw were being “cut contrary,” that is, contrary to the plan Plum Creek submitted and FPR approved.
*216 ¶ 49. At that point, all logging work stopped. The forestland in the three stands became the equivalent of a “crime scene.” Over time, the county forester went back and took measurements of what had been cut in relation to the specifications in the plan. On April 26, he issued an adverse-inspection report recommending that Plum Creek be terminated from the current-use program. The FPR Commissioner accepted the recommendation, and this controversy unfolded. Plum Creek hired a professional forester to independently evaluate the state of the forest and the allegations of the county forester. Part of the evaluation was to measure regeneration three years after the harvest was terminated. The case proceeded to trial in the superior court, and the court took a view of the stands in the condition they were when logging stopped. Plum Creek took many pictures of the forest at that time, many of which were introduced into evidence. As far as the record before us discloses, the land and forest in controversy is in exactly the same state today as when the site visit occurred over six years ago.
¶ 50. I start with this short story to make three points to which I will return. First, the amount of the land that had been logged has no significance, other than that it was frozen at the time of the site visit. The timeline shows, however, that the entire harvest would have been over in a matter of days if it had been allowed to run its course. Second, no one has claimed that Plum Creek did anything illegal, whoever one might believe in this controversy, so my comparison to a “crime scene” is a purely hypothetical one.[11] The sole issue is whether Plum Creek complied with its plan and whether, as a result, it can receive the substantial monetary benefit of the enrollment of 56,604 acres of forestland in the current-use program.[12] Third, Plum Creek’s decision to stop the *217 harvest was required by the county forester’s declaration that Plum Creek had violated its plan and the AMPs requirements, the prospect of civil penalties and criminal liability for violating the AMPs requirements, the prospect that all its land would be removed from the current-use program, and most important a subsequent specific direction of FPR. The majority disagrees with this point, as shown by its three footnotes on the issue — ante, nn. 8, 9 and 10 — and is acknowledging through these footnotes that the point is central to its rationale. Accordingly, I have added a separate section at the end of the dissent summarizing the facts that show why the majority’s conclusion is wrong. See infra, ¶¶ 121-184. If Plum Creek had completed the harvest it would have had no evidence of the state of the harvest at the time of the forester’s declaration, evidence that became critical in the defense of this case.[13]
¶ 51. My disagreements with the majority are deep and extensive and take many pages to fully explain. There are, however, three other points to which I will return on numerous occasions, and I summarize them here as a road map through this dissent. First, by statute, the standard for judicial review in this case is de novo, a standard that by definition provides the broadest and most extensive judicial review of administrative action. While the majority has paid lip service to that standard, it has actually employed the narrowest and most agency-deferential standard of review possible, turning the statutory standard into its opposite. If the standard of review were applied the way it is written, the superior court decision would be affirmed. In In re Town of Sherburne, we recognized in regard to the standard for review of administrative action that courts have a tendency to recite “ ‘a *218 batch of verbiage and then pay[ ] no attention to what it has said in determining what to do.’ ” 154 Vt. 596, 607, 581 A.2d 274, 280 (1990) (quoting 5 K. Davis, Administrative Law Treatise § 29:27, at 456-57 (2d ed. 1984)). This is exactly what the majority has done here.
¶ 52. Second, the majority has reversed the decision of the trial court, without a remand, holding that as a matter of law the agency must prevail. At best, this would be an unusual and exceptional action, particularly after four days of trial and extensive evidence and findings of fact, none of which are found to be erroneous. If the trial court employed the wrong standard of review, the remedy is to remand the matter to the trial court to apply the right standard in light of the evidence and findings of fact. After reading the majority opinion, it is difficult to see what the purpose of the trial was or whether Plum Creek’s extensive evidence could even be considered. Indeed, it is hard to understand the purpose of judicial review at all.
¶ 53. Third, the sole question on which this case turns is whether Plum Creek violated a timber-harvesting plan that it drafted and the agency approved. I have attached the plan to this dissent. The superior court found that Plum Creek did not violate the plan. The State claims it did but does not identify the language in the plan it says was violated. The majority adopts the theory of the State because the State’s interpretation of the plan is entitled to deference, again with no specific identification of the requirement in the plan that was violated. The result is that the State is entitled to create plan requirements as it goes along, with no advance notice to a landowner and no inclusion of the requirement in the plan document.
¶ 54. Having identified these recurring points, I agree with the majority that proper identification of the standard of review that governs the superior court’s review of the decision of FPR to terminate Plum Creek from the current-use program is important, and much of this dissent is about the proper standard of review.
¶ 55. For an instant in its opinion, the majority acknowledges that the Legislature has established the standard of review of the administrative decision for this case as de novo. The leading treatise on administrative law states the “meaning of the de novo standard” as follows:
This standard tells a court to affirm the agency only if it agrees with the administrative conclusion either as to *219 the entire administrative decision or some part of it. If the court does not agree, the court is instructed to substitute its own judgment.
C. Koch & R. Murphy, Administrative Law and Practice § 9.22[1] (3d ed. 2016).
¶ 56. This is exactly the meaning of de novo review that our decisions reflect. For example, in Town of Victory v. State, we rejected the application of de novo review in the absence of a legislative direction to use it because “[d]e novo review, whereby the superior court would simply substitute its judgment for that of the director, necessarily usurps power delegated to the executive branch; therefore that standard is inappropriate unless the statute expressly so provides.” 2004 VT 110, ¶ 16, 177 Vt. 383, 865 A.2d 373 (emphasis added). As I discuss below, de novo review here means that judicial review is not based on the agency record; indeed, it could not be here because there is virtually no record. I recognize that we have adopted a presumption against de novo review when the review statute does not provide for it. Where, as here, the Legislature expressly provides for it, we must follow the legislative direction.
¶ 57. Instead of implementing this standard of review, the majority has adopted its own standard, unsupported by the governing statute, which is exactly the standard of review that we would adopt if de novo review was not commanded by the Legislature. Indeed, it is exactly the opposite standard of review, as narrow and limited as exists anywhere in our law. In doing so, it has emasculated judicial review, overturning a trial decision based on four days of trial without deciding that any of the findings of fact of the trial court are erroneous and without a remand for factfinding under what it views is the correct standard of review.
¶ 58. This is a case where under neutral standards, de novo review would be appropriate even if the Legislature was silent on the nature of review. There is no factual development in the administrative agency: Plum Creek was not entitled to an evidentiary hearing before the FPR Commissioner; the Commissioner did not offer an evidentiary hearing; and, most importantly, this is not a decision where agency expertise is central. The administrative record is virtually nonexistent, consisting of the county forester’s violation determination, the Commissioner’s de- *220 cisión, and Plum Creek’s filings in opposition to the termination decision. This is a pure adjudicatory case with little or no policy issues. The fundamental issue in this case is what the plan drafted by Plum Creek means — the agency was not interpreting and applying a statute, regulation, or even a policy. Plum Creek is essentially charged with breaching its permit application; in comparable situations, the agency does not get particular deference in that decision.
¶ 59. The majority has adopted a standard of extreme deference that makes the administrative decision controlling with no meaningful opportunity to contest it. Even if such deference were ever appropriate where the Legislature adopts de novo review, it is totally inappropriate in the case before us. As the trial court concluded, this level of deference allows the agency to create new rules as it goes along where the rules should be set in the controlling documents.
¶ 60. Finally, it is clear from the way that the majority has written its decision that it believes that the only right answer to the circumstances before the court is that provided by the State and that Plum Creek is relying on a technicality to avoid its just consequences. In fact, the evidence before the trial court showed many possible rationales, not built on technicalities, on which to resolve the conflict, and Plum Creek’s explanation for what it did, as accepted by the trial court, was reasonable. The short answer to the majority’s factual assertions is that the case was tried by a very experienced trial judge who made detailed and thorough findings of fact and conclusions based on them, which should be respected rather than rejected out of hand. I will address each of these points below.
I. This Was a Pure Adjudicatory Proceeding Based on Whether or Not Plum Creek Complied with Requirements Contained in Two Documents, and the Evidence and Findings Show It Did Comply
¶ 61. To be eligible for the current-use or Use Value Appraisal (UVA) program, forestland must be “under active long-term forest management ... in accordance with minimum acceptable standards for forest management.” 32 V.S.A. § 3752(9)(A). “Minimum acceptable standards for forest management” are defined, in turn, as “refer[ring] to certain standards established by the Commis *221 sioner of Forests, Parks and Recreation.” Id. § 3752(13). Eligibility also generally requires compliance with “the regulations adopted by the [Current Use Advisory] Board.” Id. § 3755(a); see id. § 3753 (establishing Current Use Advisory Board). Comprised of the Commissioner of Taxes, the FPR Commissioner, the Director of the Division of Property Valuation and Review (PVR), members of the private agricultural and forestry sectors, and local government representatives, id. § 3753(b), the Board has several legislatively defined duties: to periodically review the criteria for enrollment in the UVA program, recommend changes and improvements, and adopt rules to carry out its statutory goals. Id. § 3754(a), (c). The UVA Program Manual adopted by the Board sets forth minimum standards for forest-management plans, minimum standards for forest management and regeneration, standard forms for use by landowners enrolled in the program, and appendices containing additional guidance for foresters and landowners.
¶ 62. If any of the above statutes, rules, or policies were involved in this case, the FPR Commissioner would be entitled to substantial deference in interpreting them, a point discussed below. The Commissioner did not conclude, however, that Plum Creek violated any of those statutes, rules, or policies. Instead, the FPR Commissioner concluded that Plum Creek violated a timber-harvesting plan that Plum Creek itself drafted. No policy is involved in determining whether the plan was violated. I would accept that a decision to reject a plan would involve policy, and that decision would be based on agency expertise. But once the plan is accepted, the only relevant determination is whether the plan was violated.
¶ 63. Forestland is eligible for the UVA program if the landowner prepares and submits a ten-year forest-management plan and it is approved by FPR. Id. § 3755(b)(1)(C). In this case, Plum Creek had such a plan prepared by the company that owned the land before Plum Creek. The plan specified that when Plum Creek was to engage in timber harvesting, it was required by the plan to seek and have approved a plan amendment for each “stand” in which the harvesting would occur. These amendments are known as prescriptions, and Plum Creek prepared one and had it approved for each of the three stands involved in this case. The prescriptions are prepared on forms supplied by FPR and are very short documents. I have attached the relevant content of *222 these documents to this dissent in an appendix; the content takes up less than two pages. Thus, the decision to remove the land had to be based on a conclusion that Plum Creek’s timber harvesting violated either the ten-year management plan or the relevant prescription; in this case it was based entirely on the prescriptions. These documents were drafted by the landowner, not the agency. See Vt. Dep’t of Forests, Parks and Recreation, Use Value of Forestland in Vermont at 2 (Feb. 1, 2006) (“County foresters who are employed by the State do not write use value plans. Their role is to advise landowners and consulting foresters, review and approve management plans . . . and to conduct on-site monitoring.”). They are essentially applications for a permit, and the controlling question is whether Plum Creek did what it said it would do in its application.
¶ 64. To a great degree the dispute has centered on cutting in Stand 34 and a rationale that pervades the decisions with respect to each of the stands — that the extent of cutting had to be even across the stand so the remaining forest after cutting would be the same throughout the stand. The Commissioner’s decision focused on this stand and this rationale, and the majority decision has almost exclusively focused on it. The trial court found that the residual basal area (RBA) in the cut portion of Stand 34 was 28.5, only a small amount below the lower specification in the minimum prescription RBA of 30 to 40, and that the RBA for the whole stand was 47.4.[14] In his two-page adverse-inspection report, the county forester included three short sentences describing the violation in Stand 34:
Stand has been cut contrary to prescribed silvaculture. Stand inventoried on 2/10/2010 and 2/12/2010. Residual basal area across 90.91 acres of the stand reduced to 19.7 square feet (36 inventory points with 2.63 standard error).
¶ 65. The Commissioner gave three reasons why Plum Creek had violated its Forest Management Plan for this stand:
[1] There was no indication that the cutting plan would have been modified had the sale reached completion. In *223 fact, Plum Creek’s forester stated that the logger was not following their directions. The determination of “cut contrary" was based upon ttwse acres cut to date, similar to any other violation that the state has pursued in the past.
[2] Although the unit of measure for forest management purposes and UVA is the “stand,” management can alter the unit enough to create different stands. As a “stand” is a contiguous group of trees sufficiently uniform in age-class distribution, composition and structure, and growing on a site of sufficiently uniform quality, to be a distinguishable unit, the harvesting in stand 34 has created two separate stands as that area harvested has a very different age-class distribution, composition and structure now compared to that area left untreated. They are no longer the same stand; therefore, they should be sampled and evaluated separately.

[3] The basis for the shelterwood method as a method of regeneration is that it creates a moderated microenvironment that promotes seed germination and seeding establishment as it elevates light levels near the ground and reduces the withdrawal of soil moisture. To create this microenvironment, the application of the method involves leaving a residual overstory of large crowned, seed bearing trees that are uniformly distributed over the area of the new stand. The notion that the goals and objectives of the shelterwood treatment were met by considering shade from trees over a kilometer away (in the uncut portion of the stand) as providing the necessary microenvironmental condition is a misapplication and a complete misunderstanding of the principle of the silvi-culture practice. The residual basal area of 19.7 square feet is considered a commercial clear cut. Additionally, the residual trees comprising this basal area are at best intermediate stems in the 10 to 12 inch diameter class that lack the crown size necessary to provide the shading conditions even if the desired residual basal area target was met. Plum Creek’s prescription should not be narrowly interpreted to just stocking levels. Recommenda *224 tions were presented relating to what would be removed (at-risk mature stems) and what would remain (sugar maples and yellow birch with large crowns, quality growing stock).
(Emphasis added.) Except for the one reference to the plan in the third reason, the decision makes no reference to the content of Plum Creek’s plan. Thus, to determine whether Plum Creek violated the plan, the superior court and this Court have to independently examine the plan language in comparison to the rationale.
¶ 66. The Plum Creek plan is contained in the appendix to this opinion. The plan says Stand 34 has 137 acres. There is no mention in the plan of an even distribution of trees. Indeed, it says “[t]he understory varies greatly in stocking of acceptable regeneration.” It says that “the majority of the overstory is unacceptable growing stock.” It says “the shelterwood will be irregular in distribution.”
¶ 67. The first and second grounds for the decision to terminate Plum Creek from the current-use program are inconsistent and unsupported by any record evidence that the Commissioner had even at the time of rendering the decision.[15] Under any standard of review, termination based on these rationales could not be sustained.
¶ 68. The first rationale states that “[tjhere was no indication that the cutting plan would have been modified had the sale reached completion.” In fact, the Plum Creek manager responsible for the tract sent a letter to the FPR county forester explaining that the timber harvesting contractor had violated Plum Creek’s instruction in a number of respects and outlining how the harvesting would be done in the rest of the stand to stay within the prescription overall. The letter was admitted into evidence as exhibit 27. It is uncontroverted and directly contradicts the Commissioner’s assertions.
¶ 69. Even if the contrary evidence did not exist, it is important to state that there is nothing in Plum Creek’s plan to suggest that the RBA measurement was to be made in the part of the stand that happened to have been “treated” when the county forester *225 appeared for an observation visit. Thus, there was no obligation for Plum Creek staff to give an “indication” they would proceed differently in the remainder of the harvest as long as they met the RBA requirement at the end. Finally, it was irrelevant how FPR had pursued alleged violations in the past. If it wanted the timber harvesting to meet the minimum RBA requirements at all times during the harvest, it should have directed Plum Creek to put that standard in the plan.
¶ 70. The second rationale is even weaker. It is based on the premise that Plum Creek — “management” in the Commissioner’s phrasing — had no intention of finishing its harvesting in the stand and was comparing the situation in the treated area with the situation in the untreated area. Thus, both the State and the majority have emphasized the Commissioner’s language that Plum Creek asserted that “the goals and objectives of the shelterwood treatment were met by considering shade from trees over a kilometer away (in the uncut portion of the stand).” The statement is entirely disingenuous because the evidence was undisputed that Plum Creek intended that there would be no untreated area and there would be harvesting in all parts of the stand. Plum Creek never argued that a shade tree one kilometer away would make up for the lack of a shade tree in another area. The reality is that there never would be a comparison between treated and untreated parts of the stand if the State had not declared a violation before the harvest was completed and prevented harvesting in the remainder of the stands.
¶ 71. Although this rationale is poorly stated in the Commissioner’s decision, it is argued by the State and accepted by the majority as a statement that the cutting that occurred on Stand 34 went beyond a RBA of 30 ft2 and, therefore, could be grounds for termination of Plum Creek from the current-use program. The State’s position is that whenever in the course of a timber harvesting FPR staff measure the RBA of the area in which harvesting has occurred the RBA cannot go below the minimum specified in the plan. Stated differently, the State’s position is that all cutting must be even across the stand with no part more cut than another. FPR points to no language in the Plum Creek plan that actually states this requirement, and there is no such language. To the extent that the plan addresses the issue, it is directly contrary to the State’s position. The plan says: “The shelterwood will be irregular in distribution.” Uneven distribution *226 of shade trees was part of the plan and could be accomplished only by uneven cutting. There is no support for the State’s position that uneven cutting within a stand violates Plum Creek’s plan.
¶ 72. It is no answer to the absence of the requirement in the plan that FPR is simply enforcing its consistent policy. Whatever may have been FPR’s policy, we are necessarily dealing here with legal requirements. FPR’s policy is not stated in the plan or in legally adopted regulations. The most important function of judicial review is to prevent an agency from acting outside the legal system in which it operates.
¶ 73. The trial court concluded that this is exactly what occurred here. It found: “In this case, the State’s evidence showed that it had relied heavily on RBA measurements . . . taken from plots in just a portion of each stand and rejected RBA evidence pertaining to the stands as a whole. In doing so, it imposed a standard that is not in the UVA manual, is not a norm in forestry practice, and was not included in the prescription.” It added “Without any rule in the UVA manual or specification in the prescription, an owner would not be on notice that RBA would be measured other than by the stand as a whole, particularly where the particular prescription calls for a result of 30-40 ‘overall stand residual basal area.’ ”
¶ 74. The majority has added a new and different rationale for the Commissioner’s decision — that Plum Creek is responsible for the measurement of only part of the stand, and must accept it, because it suspended the harvest and never restarted it. This rationale is not in the Commissioner’s decision or in the superior court decision. It is legally and factually erroneous.
¶ 75. It is factually erroneous because Plum Creek could not proceed due to the fact that FPR withdrew approval of the harvest based on the April 26 adverse-inspection report of the county forester. In the period between the end of January, when the inspection occurred that led to the termination, and the date of the adverse-inspection report, Plum Creek could not proceed because it faced civil penalties and possible criminal liability as a result of the AMPs compliance issues until it resolved those issues to the satisfaction of FPR and ANR. These facts are set out in detail in ¶¶ 128-134 of this dissent.
¶ 76. It is legally erroneous because nothing in the plan or the statute or regulations require that a harvest proceed continuously *227 without interruption. Not even FPR has argued that there is such a requirement. The majority’s position that Plum Creek violated such a requirement, and thus brought on RBA measurements of only part of the stand, has no support in the law.
¶ 77. Unlike the first two rationales, the third rationale purports to address language in the plan. It says “Plum Creek’s prescription should not be narrowly interpreted to just stocking levels.” In fact, there are no stocking levels in the plan so the Commissioner’s statement is curious at best. Nor does the plan state that the RBA minimum must be met by trees that are greater than 12 inches in diameter. Again, if FPR wants such a requirement it must insist that Plum Creek put it in the plan. Like the first rationale of the Commissioner, this rationale was not testified to by the county forester who testified for FPR in the trial.
¶ 78. The most important point about the Commissioner’s rationale is that it is based on the Commissioner’s determination that the RBA in the cut area of the stand was 19.7 ft2. In fact, as the superior court found, the RBA was 28.5 ft2, a finding of fact that even the majority accepts, as I discuss later in this dissent. The actual RBA is 50% above the RBA adopted by the Commissioner and close to the minimum RBA for the stand as a whole. It is impossible to know what the Commissioner would have decided if she had to apply the right RBA in rendering her decision and could not rely on a conclusion that Plum Creek had actually performed a commercial clear cut.
¶ 79. The majority has largely ignored the glaring holes in the Commissioner’s decision because of its holding that deference controls everything. Thus, for the majority, the Commissioner’s decision is right because it is not “standardless, unsupported by the evidence, or contrary to law,” the standard of review it finds applicable. Ante, ¶ 35. I will address later my differences on standard of review, but the point here is different — that deference has no application where the only question is whether Plum Creek complied with its plan and the Commissioner has made fundamental errors in her analysis. While the majority addresses a part of the Commissioner’s decision, it never explains how Plum Creek violated any provision of its plan. The majority decision relies on the Commissioner’s decision because it “promotes the overall policy of the UVA program,” “is logical,” “allows *228 for more effective oversight by FPR,” and “it is a method consistently used.” Ante, ¶¶ 36-39. As the above discussion states, I disagree with many of these reasons, but that is entirely beside the point. Nowhere does the majority say that the forester’s opinion is required by the plan, the central question that was before the superior court and before us. All of the majority’s points are reasons why FPR might have acted to insert the forester’s opinion into the plan that Plum Creek submitted, but they are irrelevant to this case because FPR accepted the plan without this language, and the superior court found that the opinion was not contained in or supported by the plan. That is all that should count in this decision.
¶ 80. The majority’s decision in this case is entirely different from that in Jones, 2004 VT 49, ¶ 10, the decision on which the majority most relies. In Jones, this Court quotes exactly the plan provisions it found were violated and why there was a violation. There were two such provisions. One provided that there would be “selection cuts approximately 40 feet in diameter.” Id. ¶ 5. The evidence showed “a series of clear cuts in Stand 3 well in excess of the ‘approximately 40 feet in diameter’ prescribed in the plan. Evidence of the extensive cuts — ranging in size from one to two acres — was uncontroverted.” Id. ¶ 8. The second part of the plan that was violated allowed “ ‘limited single tree and group selection cuts’ of overstocked areas of hardwoods.” Id. ¶ 10. The evidence showed that the cutting in a part of the stand that the landowner identified was “overstocked” and went well beyond the limited single-tree and group-selection cuts specified in the plan. Id. ¶ 14. The difference between the analysis in .Jones and the analysis here is glaring.
¶ 81. There are three other points about .Jones that are important for comparison in this case. First, .Jones involved a completed harvest that the forester inspected during a regular five-year inspection. Id. ¶ 5. It did not involve the interruption of a partially completed harvest with comparisons between harvested and unharvested areas. Second, to the extent that the forester acted based on part of a stand, it was because the prescription authorized cutting only in “overstocked areas” and the landowner had designated the 15.8-acre area involved as overstocked. Id. ¶ 13. There is no such designation in this case. The latter point is important because the majority asserts that Plum Creek should have known after .Jones that its compliance could be judged based *229 on cutting in only part of a stand. Even assuming that Jones gave a different landowner of different land with a different plan proper notice of an unwritten FPR policy, Plum Creek would learn from Jonss only that if the landowner specifically designated a part of a stand for a specific different treatment, and violated the requirements of the designation, it could be terminated from the current-use program. The third point is that the trial court was reversed in Jones because its findings and conclusions were “clearly erroneous.” Id. ¶ 7. The majority found no findings or conclusions clearly erroneous in this case.
¶ 82. Finally, it is important to reemphasize that the failure to find an inconsistency with the plan is not fixed by the choice of standard of review.[16] Under any standard of review, the superior court found that FPR’s decision is based on a requirement that is not in the Plum Creek plan, and the majority has not, and cannot, respond to this conclusion that is determinative of the proper outcome of this case.
*230 II. Standard of Review is De Novo
¶ 83. Having covered the first reason why the majority decision is wrong, I turn to the second — that the majority has used a standard of review inconsistent with the governing statute.
¶ 84. I started this dissent with the meaning of de novo review. While the majority admits that de novo review applies, it is helpful to explain why de novo review is the governing standard. The short answer is because that is what the governing statute says: “An appeal of this decision of the Commissioner may be taken to the Superior Court in the same manner and under the same procedures as an appeal from a decision of a Board of Civil Authority, as set forth in chapter 131, subchapter 2 of this title.” 32 V.S.A. § 3758(d). The cross-reference is to the subchapter on property tax valuation appeals to the superior court or to the PVR Director. We explained the effect of this cross-reference in Mollica v. Division of Property Valuation & Review, 2008 VT 60, 184 Vt. 83, 955 A.2d 1171, in the context of an appeal from PVR. Although Mollica was controlled by § 3758(a), rather than § 3758(d), the language governing the appeal was identical in those subsections.[17] Thus, we recognize Mollica as a binding precedent of the interpretation of both subsections. As Mollica holds, the effect of the cross-reference is that appeals to superior court from a decision of the FPR Commissioner is de novo. Mollica, 2008 VT 60, ¶ 8; see 32 V.S.A. § 4467 (stating that superior court on appeal “shall proceed de novo and determine the correct valuation of the property as promptly as possible”).
¶ 85. I recognize that it is possible that review can be de novo and on the record generated in the administrative agency at the same time. The appeal process under 32 V.S.A. § 4467 is not on-the-record review. As explained in Shaffer v. Town of Waitsfield, 2008 VT 44, 183 Vt. 428, 956 A.2d 520:
*231 The proceeding before the appraiser was a de novo hearing, 32 V.S.A. § 4467, which we have consistently held requires the appraiser to try the dispute anew, as though it had never been heard before. This means that the Town was not limited to proffering — and the appraiser was not limited to considering — only such evidence as was presented below, and that the appeal presented taxpayers with the risk of increase as well as the chance of decrease.
Id. ¶ 10 (quotation omitted).
¶ 86. Mollica recognized this. 2008 VT 60, ¶ 8. The trial court here proceeded exactly as specified in Shaffer. Although the majority has reversed the court, there is no suggestion that it proceeded improperly.
¶ 87. Property valuation appeals regularly become battles of expert witnesses, with the municipality’s expert witness having no special status greater than the expert witness supplied by the taxpayer, and the court or hearing officer ultimately resolving the matter. A good example of the process is contained in our recent decision on property valuation, Vermont Transco LLC v. Town of Vernon, which involved a utility transmission property valued by the Town at $92 million. 2014 VT 93A, 197 Vt. 585, 109 A.3d 423. The decision turned on whether the Town used the proper methodology for valuing this unique property. The evidence came largely from two expert witnesses who presented different valuation methodologies.
¶ 88. I believe we should apply de novo review in this case even if the Legislature had not directed it. Although we have applied a strong presumption against the availability of de novo review of the decision of an administrative agency, we have generally relied on the analysis of the federal courts under the Federal Administrative Procedures Act (APA). See State Dep’t of Taxes v. Tri-State Indus. Laundries, Inc., 138 Vt. 292, 293, 415 A.2d 216, 218 (1980). The Federal APA provides a number of options from which reviewing courts choose the proper standard of review of administrative action. 5 U.S.C. § 706(2). Among the grounds for reversal is that the administrative decision is “unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.” Id. § 706(2)(F).
*232 ¶ 89. De novo review under 5 U.S.C. § 706(2)(F) plays a very limited role in judicial review of administrative proceedings. In Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), abrogated by Califano v. Sanders, 430 U.S. 99 (1977), the U.S. Supreme Court ruled that § 706(2)(F) is applicable in only two instances, one of which would govern this case: “[S]uch de novo review is authorized when the action is adjudicatory in nature and the agency factfinding procedures are inadequate.” Id. This case is an adjudicatory proceeding specifically authorized by statute. The agency “factfinding procedures” are inadequate; in fact, they are nonexistent. If § 706(2)(F) were applicable here, it would require de novo review.
¶ 90. My conclusion that the factfinding procedures are inadequate requires explanation. The vast majority of administrative decisions are reviewable within the agency under the extensive procedures contained in the Vermont Administrative Procedure Act (Vermont APA), 3 V.S.A. § 800 et seq. For proceedings subject to it, the Vermont APA requires a hearing at which a party can present evidence, id. § 809(c), and cross-examine witnesses, § 810(8), and on which the decisionmaker renders findings of fact based on the evidence, id. § 812(a). These requirements, however, are applicable only in a “contested case,” defined as a proceeding “in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing.” Id. § 801(b)(2); see also id. §§ 809(a), 810, 812(a).
¶ 91. The administrative review statute applicable in this case provides that an “owner who is aggrieved by . . . the filing of an adverse inspection report . . . may appeal to the Commissioner” within sixty days of the filing of the report. 32 V.S.A. § 3758(d). There is no requirement of a hearing before the Commissioner. Although there was a face-to-face meeting between the Commissioner and representatives of Plum Creek, no evidence was taken, and there is no transcript of what transpired. There are no findings of fact. The decision of the Commissioner is apparently based primarily on the decision of the FPR county forester, even though there is no indication the forester was present at the meeting. The record as transmitted by the Commissioner to the superior court pursuant to Vermont Rule of Civil Procedure 74 consists of the decision, the letters and documents filed by Plum Creek, and the written decision of the county forester.
*233 ¶ 92. The point is that there are no factfinding procedures applicable in this case. The majority states that:
The Commissioner examined the evidence supplied by the county forester and concluded that both the evidence and the methodology were sound. The Commissioner found that the data were collected appropriately and compliance was measured according to the correct methodology.
Ante, ¶ 13. While it would have improved the Commissioner’s decision if she had done and said what the majority attributes to her, her decision does not contain what the majority claims. The Commissioner’s decision does say, “The violation is clear and undisputed by information provided by Plum Creek.” Even the short description of the process before the Commissioner included in the majority decision shows the latter part of this statement is erroneous.
¶ 93. There is an obvious reason why the majority’s statement is unsupported by the record — there is almost no record. As I described above, the record consists of the violation decision of the county forester, the filings of Plum Creek, and the decision of the Commissioner. The Commissioner’s decision contains findings and conclusions that are not in the forester’s letter or the filings of Plum Creek. The record does not include any information on which the forester relied, any information on the action of middle-management of FPR between the forester and the Commissioner,[18] or the source of many findings and conclusions of the Commissioner. The situation here is essentially identical to that in Conservation Law Foundation v. Burke, 162 Vt. 115, 645 A.2d 495 (1993):
In order for judicial review to proceed on the record, it is critical that the court have before it the full agency record that was before the Secretary at the time he *234 made his decision. . . . Thus, if the agency decision-maker’s decision is based on the work and recommendations of subordinates, the record should include all documents considered by the agency employees whose input reached the decisionmaker.
Id. at 127, 645 A.2d at 502 (quotations omitted).
¶ 94. Burke was not a de novo review proceeding. Id. at 126, 645 A.2d at 502. The record in that case was as incomplete as that in this case. We held in that case that the superior court must remand the case to the agency to obtain a proper record before proceeding. Id. at 127-28, 645 A.2d at 503. Here, the inadequacy of the supplied record supports the de novo evidentiary hearing held by the trial court to establish a record.
¶ 95. I recognize that Burke held that de novo review was not available even in a case where there is no administrative factfinding and no record on which effective judicial review could have gone forward. As in Burke, the reviewing court in this case could have required the production of a complete record of the administrative action, the proper remedy if de novo review were not statutorily required. In my view, the difference lies in the nature of the administrative decision. In Burke, the decision involved the evaluation of the public health and safety effects of emission of toxic substances from a solid waste incinerator as part of a complex regulatory process. In that circumstance, agency expertise was critical and the need for deference to the agency decision was high. This case, by comparison, essentially comes down to counting trees where agency expertise is relatively unimportant. I will explain the need for expertise in this case below. I emphasize that the above discussion is about how judicial review should have proceeded had there been no legislative requirement of judicial review. In this case, the Legislature has required de novo review, and we are required to follow that direction.
¶ 96. Finally, on this point, it is important to recognize that the Commissioner could have chosen to hold an evidentiary hearing but did not. An evidentiary hearing would have prevented, at least in part, the difference between the information on which the Commissioner rendered her decision and the testimony and evidence on which the superior court rendered its decision. In fact, under the nonprocess employed, there were no self-imposed *235 restrictions on how the Commissioner chose to find the relevant facts, and her decisionmaking process is opaque apart from her reliance on the FPR forester.
III. The Majority’s Standard of Review is Wrong and Inconsistent with the Legislature’s Direction
¶ 97. In Town of Victory v. State, 2004 VT 110, ¶¶ 14-24, we were required to determine the standard of judicial review of a decision of a state agency in valuing state-owned real property in a town under the state PILOT (payment in lieu of taxes) program. Unlike in this case, the Legislature had provided the right of appeal of a PILOT determination but did not specify the standard of review. We posited three possible choices: de novo review; review under chapter 131 of subchapter 2 of Title 32, specifically 32 V.S.A. § 4467; or traditional deferential on-the-record judicial review. We essentially found that choices one and two were the same, using the analysis discussed above. Id. ¶¶ 14-21. We defined the third possibility as follows: “The third possibility is that the Legislature intended the superior court to treat § 3708 appeals just as it treats appeals from other administrative actions — that is, it should review the record and overturn the agency’s determination only if it finds it arbitrary and capricious.” Id. ¶ 22. In the absence of a legislative directive to the contrary, we chose the third possibility.
¶ 98. Although there are slight differences in the language, the majority has chosen the third possibility in this case. The decisions which it states have the proper standard of review, In re Johnston, 145 Vt. 318, 488 A.2d 750 (1985), and In re DeCato Bros., Inc., 149 Vt. 493, 546 A.2d 1354 (1988), are unremarkable examples of “arbitrary and capricious” review based on the administrative record, exactly the standard of review we would have chosen under Town of Victory in the absence of legislative direction to the contrary. In each of these cases there was an evidentiary hearing at the administrative level and findings of fact and conclusions of law. In Johnston, the appeal came directly to the Supreme Court so there could be no independent fact-finding. In DeCato, the judicial appeal went first to the superior court but again it was on the administrative record and the evidence in the administrative hearing. Thus, judicial review in each case proceeded under the Vermont APA, and the standard of review was that routinely applied in APA review.
*236 ¶ 99. The problem with deriving the standard of review from these cases is obvious. In this case, the Legislature has specified a standard of review, and it is not the third possibility specified in Town of Victory, highly deferential on-the-record review. Instead, it is a form of de novo review used in property tax appeals. The majority has turned the statutory standard of review into its polar opposite. How it has done so is a fascinating process that reminds me of the child’s game of broken telephone where “a child whispers a phrase into the ear of a second child, who whispers it into the ear of a third child, and so on. Distortions accumulate, and when the last child announces the phrase, it is comically different from the original.” S. Pinker, Words and Rules: The Ingredients of Language 47 (1999).
¶ 100. The starting point in the majority analysis is two sentences from Jones, 2004 VT 49. Jones was a case similar to this one, but the statutory standard of review statute is not reflected anywhere in the decision; apparently neither party recognized its substance and application. The two sentences are: “We discern no basis to conclude that the Department’s finding of a violation in this case was standardless, unsupported by the evidence, or contrary to law. Accordingly, we conclude that the court’s findings were clearly erroneous and must be reversed.” Id. ¶ 14. The majority finds the first sentence to contain the applicable standard of review.
¶ 101. Even if we assume that the Court was aware of the statutory standard of review, I would not find that the language in Jones on which the majority relies was intended as a statement of the standard of review for that and following cases. The first sentence is not followed by a citation to any authority, and the words do not appear in any earlier case, or in any statute, as a standard of review. Certainly, if we were announcing some wholly new standard of review for current-use decisions by FPR, we would explain why we were doing that and how we had the power to do so. In fact, the words have never been cited since as a standard of review, and the development of the correct standard of review occurs in Mollica, a later decision, without relying upon the Jones language. Moreover, as the second sentence explains, the actual standard of review that decides the Jones case is different — that findings of fact cannot stand if so lacking in support in the evidence that they are clearly erroneous — is familiar and totally consistent with de novo review.
*237 ¶ 102. Even if we intended some new and different standard of review, the majority has turned it into something more than it says. It does not say the agency will prevail if its decision is based on a standard, is consistent with the evidence, and is consistent with law. At best, it says instead that the agency decision will prevail if those things are true and the decision against it is based on a clearly erroneous finding of fact. This is a very important point because in this case, unlike Jones, the majority finds no instance where the trial court made a clearly erroneous finding of fact.
¶ 103. I would distinguish the Jones language based on the discussion in the two paragraphs above, but I believe that the likely explanation for its presence in the opinion is that the Court, including I, was unaware of the statutory standard of review. The Jones language is fundamentally at odds with de novo review as required by the statute because under de novo review the court is expected to substitute its judgment for that of the agency when it thinks the agency is wrong. The language has no place in a decision made under a de novo standard of review. If the majority believes it does, it should explain how.
¶ 104. The next step in the majority’s analysis is to rely on In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶¶ 15-16, 196 Vt. 467, 98 A.3d 16, for the proposition that “decisions made within the expertise of such agencies are presumed correct, valid and reasonable.” As the majority states, ANR Permits is a de novo review case, but the quote is taken out of context and, as a result, the meaning is changed. The relevant paragraph of ANR Permits states:
In commencing our own review, we must first determine the standard of review that applies in appeals from the PSB sitting in its appellate capacity. As all parties noted, we generally give substantial deference to an agency’s interpretation of its own regulations — in this case, ANR’s interpretation of the VSMM. Absent a clear and convincing showing to the contrary, decisions made within the expertise of such agencies are presumed correct, valid and reasonable. Interpretation of the VSMM is squarely within ANR’s expertise as its authoring agency. This deferential standard remains on appeal, even after the PSB holds a de novo hearing on the matter.
*238 Id. ¶ 15 (footnote omitted) (quotation omitted).
¶ 105. The paragraph is solely about the deference accorded an agency in interpreting its own regulations, deference that is entirely consistent with de novo review. See Letourneau v. A.N. Deringer/Wausau Ins. Co., 2008 VT 106, ¶ 8, 184 Vt. 422, 966 A.2d 133. Thus, it was appropriate to cite and rely upon Johnston, which is not a de novo review case. To show the limit of the deference ruling, the Court added: “In keeping with the statutory standard of review, [the PSB] gave no deference to ANR’s permit decision.” ANR Permits, 2014 VT 50, ¶ 11. Thus, the decision does not give general deference to the factfinding, methodology, or conclusions of an agency, the deference involved in this case. This case does not involve the interpretation of regulations by the agency that adopted them.
¶ 106. The majority cites another part of the ANR Permits decision that it finds supports its deferential standard of review. The decision in that case involved the validity of the stormwater discharge permit for a mountain top wind electric generation project. The agency allowed the project to employ an alternative stormwater treatment practice that opponents argued was not authorized by governing regulations. As noted above, the decision turned entirely on whether the design was consistent with the regulations as interpreted by ANR and the Public Service Board (PSB). In reaching our decision that ANR and the PSB properly interpreted the regulations we noted that the Legislature explicitly gave statutory discretion to ANR in determining whether to issue a stormwater discharge permit and that the PSB had to respect that discretion even within the context of de novo review. Id. ¶ 16.
¶ 107. The ANR Permits analysis cannot change the standard of review in this case. In the context of renewable energy projects, a large number of types of ANR permits are reviewable de novo by the PSB under 10 V.S.A. § 8506. Some of these give specific discretion to ANR in deciding whether to issue a permit; others do not. See 10 V.S.A. § 8503(a). Despite the presence of de novo review, the PSB is required to apply the “substantive standards” applicable to ANR, including any discretion ANR has in determining whether to issue a permit. Id. § 8506(d); ANR Permits, 2014 VT 50, ¶ 16. This is the context of ANR Permits.
¶ 108. Here the standard of review is imposed by statute, 32 V.S.A. § 3758(d), for only two administrative actions by FPR: filing *239 an adverse-inspection report that results in termination from the current-use program or refusal to approve a forest-management plan. Under the majority’s standard-of-review theory, because either of these actions lie in the discretion of FPR, the statutory standard of review is cancelled and replaced by deferential review. To state the theory is to expose how illogical it is. ANR Permits does not create a way for a court to refuse to apply the standard of review specified by the Legislature.[19] FPR is entitled to no deference under ANR Permits.
¶ 109. Finally, the majority pivots to a case involving an APA contested case appeal, after an agency hearing, where the standard of review is explicitly deferential and not de novo, In re Williston Inn Grp., 2008 VT 47, ¶ 13, 183 Vt. 621, 949 A.2d 1073 (mem.), demonstrating it has reached the point where there is no difference between a de novo standard and a deferential, on-the-record standard.
¶ 110. The ultimate test of the holding on standard of review has to be whether we have complied with the governing judicial review statute. Whatever the logical twists and turns in analyzing the standard of review, and even if each step of the way appears to be consistent with and controlled by precedent, the result must be consistent with the statute. In the terms of “broken telephone,” the result of the majority’s analysis is “comically different” from the statutory standard. The majority has turned the statutory standard of review into its polar opposite and found against Plum Creek as a matter of law on the polar opposite standard of review.
IV. The Decision Does Not Involve Policy
¶ 111. The majority decision states and reiterates the need to protect and rely on agency expertise in numerous places in support of its deferential standard of review. In citing and discussing ANR Permits, it describes the agency decisions here as “complicated methodologies within an agency’s expertise.” Ante, ¶ 30, citing ANR Permits, 2014 VT 50, ¶ 16. There are three issues on which methodology was disputed: (1) whether even cutting was required so that the area cut never fell below the *240 minimum; (2) the actual RBA in the cut area; and (3) when tree regeneration measurements should be taken to determine whether the goals of the harvest were achieved.
¶ 112. Whether even cutting was a proper requirement was the subject of expert dispute, and under the statutory standard of review, the superior court could substitute its judgment for that of the Commissioner as I explain above. The superior court believed the expert witness for Plum Creek and not the FPR expert witness, the county forester, and should be affirmed on that basis.
¶ 113. My main view on even cutting, however, is different. If even cutting was a plan requirement, it had to be explicitly stated in the plan. The wording of the plan is actually contrary to a requirement of even cutting — it indicates that the shelterwood is irregularly distributed and the “overall stand” RBA must be 30 to 40 ft2. FPR’s expertise may be appropriate to determine whether even cutting should be required, but if it decides even cutting is required it must put it in the plan or a separate regulation. In this case, it did not, and Plum Creek cannot be terminated based on the nonexistent requirement.
¶ 114. The second point of dispute is actually relied upon in the Commissioner’s decision. The decision states that the RBA for the cut area in Stand 34 was 19.7 ft2, just above 60% of the required minimum RBA. The superior court found the RBA of the cut area was actually 28.5 ft2, only 5% below the required minimum RBA. Again, the superior court’s conclusion was based on the testimony of Plum Creek’s expert witness who testified that he measured more trees than the county forester so that the extent he had to extrapolate to reach the estimated RBA was less. The court found:
Apart from whether RBA is measured across a stand as a whole, the Court finds that Mr. Holleran’s methodology for measuring RBA produced a more reliable result, as it was based on measurements taken from a significantly greater number of sample plots. His additional explanation of the difference between his figures and Mr. Langlais’s is credible: that it was likely attributable in part to Mr. Langlais not counting all the trees in the sample plots, thereby producing a lower RBA measurement. While Mr. Langlais testified generally that his measurements were taken in a manner consistent with the UVA manual, the Court finds the quality and reliability of Mr. Holleran’s measurements to be superior.
*241 The majority states that the trial court could make this factual determination, apparently because, despite the disagreement with the county forester’s methodology, and the Commissioner’s finding based on that methodology, the disagreement is over the relatively simple matter of counting trees. Ante, ¶ 23 n.7.
¶ 115. The majority answers, however, that the RBA calculation difference is irrelevant because it came out under a 30 ft2 RBA, no matter how slightly. Even under the majority’s rationale I find that explanation insufficient. The Commissioner’s decision relied upon the fact that the RBA was 19.7 ft2, which would indicate there had been a commercial clear cut. In fact, the RBA was very close to the minimum. The Commissioner was concerned about whether a part of the stand would have “a very different age-class distribution, composition and structure” from the rest of the stand. In fact, if the harvest were completed within the RBA minimum, as intended, it is not clear there would be a “very different” remaining growth anywhere in the stand. The problem, of course, is that the FPR policy that it is implementing is written down nowhere so it is impossible to know what it actually is, a large deficiency when FPR claims it can come in at any time during the harvest of an irregular shelterwood to measure compliance. At a minimum, the Commissioner should be required to explain why an RBA of 28.5 ft2 is inadequate in these circumstances.
¶ 116. The third issue in dispute was joined particularly with respect to Stand 43, a different stand from that considered by the majority, but I will consider it here because it is mentioned in the Commissioner’s decision with respect to Stand 34. As I excerpted above, the Commissioner’s decision states: “the residual trees comprising this basal area are at best intermediate stems in the 10 to 12 inch diameter class that lack the crown size necessary to provide the shading conditions even if the desired residual basal area target was met. Plum Creek’s prescription should not be narrowly interpreted to just stocking levels.” Putting aside whether a landowner can be terminated from the UVA program based on noncompliance with a “broad” interpretation of the plan based on a plan requirement that is not actually in it, the facts as found by the superior court are contrary to the Commissioner’s apparent conclusion.
¶ 117. The county forester criticized the harvest because it did not produce the promised regeneration of new trees — he found *242 “there was regeneration in only 15% of the plots examined.” This opinion was based on a standard of regeneration of 350 stems per acre immediately after the harvest. Plum Creek’s expert witness, by comparison, did a regeneration study three growing seasons after the harvest, also against a standard of 350 stems per acre. He found a regeneration rate of 12,000 seedlings per acre, far exceeding the minimum requirement. The superior court accepted the conclusion of Plum Creek’s expert witness because the UVA manual standard is measured three years after the regeneration harvest and the witness’s measurements were more reliable.
¶ 118. Although the majority has not responded to the superior court’s analysis and conclusion, it essentially involved the same level of competency as the counting of trees to measure the RBA. It was also the counting of trees, in this case small ones, to measure regeneration. The main difference between the superior court’s conclusion and that of the Commissioner involved when the measurements were taken; the superior court’s measurement time was in compliance with the governing UVA manual; the Commissioner’s conclusion was not.
¶ 119. Again, the superior court conclusion does not involve policy for the same reason that the resolution of the RBA issue does not involve policy. While it does not address a requirement that is stated in the plan, the conclusion of the superior court is nevertheless important for an understanding of the Commissioner’s decision. Reduced to its main point, the decision here is about regeneration of a healthy and productive forest. The Commissioner concluded that the cutting level was too great to allow regeneration. Plum Creek proved that regeneration, orders of magnitude above what was required, were occurring and thus the harvest cutting rate was a success. The superior court agreed with Plum Creek.
¶ 120. Because of the regeneration result, this dispute is largely about a technicality. That is my last point in the following section.
V. The Facts Support Plum Creek’s Position
¶ 121. There are some important facts not contained in the majority’s recitation that bear on whether Plum Creek’s position was reasonable and the trial court acted within its discretion in accepting it. One group is laid out in the opening two paragraphs of this dissent, and I will return to these facts below. Another group relates to the present condition of the forest over which *243 this controversy arises and the goals of the logging activities that FPR approved.
¶ 122. The overall forest in this case was in poor condition to support commercial forestry. The prescription for each of the stands in controversy states that the stand “has high residual stand damage” and the beech trees are diseased. See Appendix. The trial court described the situation and the goals of the timber harvest as follows:
[T]he general goals were to cut in a manner to change a poor quality old forest into a new forest through the creation of new growth. This would be accomplished by harvesting damaged trees and large trees that would inhibit the growth of desirable young trees, promoting the growth of desirable young trees, retaining trees that could provide seeds and shade for new growth in a desirable growth pattern, establishing even age management on the stands with both existing young trees and new growth, and optimizing conditions for growth for the future.
If this had been a forest in which 100% of the trees were valuable and desirable for sale and the goal was to maximize return on these trees, the requirement that logging occur evenly over a stand would be reasonable and understandable such that excessive harvesting in one part of the stand would be a clear indication that excessive harvesting overall was intended.
¶ 123. The situation in this case was very different. Thus, the prescription for Stand 34, the stand in which this conflict primarily developed, stated: “The shelterwood will be irregular in distribution and will target Sugar Maple and Yellow Birch with large crowns to provide shade and seed distribution.” It added, “the portions of the stand will also receive 1-2 acre patches where quality and stocking are not sufficient for shelterwood.” See Appendix. Given the “irregular distribution” of logging activity, the presence of an arbitrary area in the stand with a lower RBA than contemplated overall was entirely expectable. Put another way, even cutting was highly unlikely because the trees that needed to be cut were not evenly distributed over the stand. The cutting could not occur pursuant to some artificial standard of equal harvesting per acre.
*244 ¶ 124. Finally, it is important to understand that the measure of success for Plum Creek was whether regeneration occurred as a result of the harvesting, the exact goal that the Commissioner stated she was enforcing. The evaluation of the partial harvest three years later shows that it was an overwhelming success — the regeneration levels are orders of magnitude in excess of what was required. Thus, Plum Creek is being heavily penalized for a success.
¶ 125. This, and the facts in the opening paragraphs, brings me to the heart of my disagreement with the majority’s characterization of the facts and Plum Creek’s perspective on the facts. This conflict would likely never have arisen in the courts if the timber harvesting was completed in the three stands, and that completion was only days away when the site visit occurred. Plum Creek never intended to harvest only part of the stand and certainly not only the part of the stand that had been logged to that point. The fact that only part of the stands were harvested, and harvest measurements are available only on a part of the stands, was a direct result of the FPR forester’s conclusion based on the site visit that the stands were being “cut contrary.” While there is no indication that the FPR forester could or did order the logging stopped, Plum Creek was put in a position of stopping logging operations to protect itself from a FPR decision to terminate it from the UVA program.[20]
¶ 126. The majority has fixed on its view that it makes no sense to average between the logged area of a stand and the unlogged area, relying particularly on the Commissioner’s statement that considering a tree a kilometer away in the uncut portion to determine compliance for a tree in the cut portion was a “misapplication and a complete misunderstanding of the principal of the silviculture practice.” Everyone agrees with the Commissioner’s statement, including Plum Creek’s expert, but it does not answer the basic problem with the State’s position. Plum Creek never intended to harvest only part of a stand and did not claim so here. This is an example of attributing a position to a party to tear it down — a strawman position. The Plum Creek position has *245 always been that the harvest could not be judged in midstream and should have continued to its end, and then it could be judged on whether it violated the plan. The cause of this controversy is the stopping of the timber harvest days away from its completion and the required determination of whether the plan was violated by a timber harvest that was never completed. Plum Creek’s expert testified that Plum Creek could complete the harvest fully compliant with the provisions of the plans, particularly the minimum basal area requirements and the use of appropriate treatments in each part of the stands. He noted particularly about Stand 34 that the area that had been logged had been extensively damaged by the 1998 ice storm.
¶ 127. By footnotes 8, 9 and 10 the majority has added to its position that it was fair to consider only part of the stands by stating that if Plum Creek intended that the RBA be judged on the stands as a whole, it should not have shut down the harvest at the time of the initial inspection on January 26, 2010 and should have completed it at some time thereafter. The majority asserts that stopping the harvesting was wholly a decision of Plum Creek and not a decision of FPR. Even the limited facts in the record show that this position is wrong.
¶ 128. There were two adverse consequences of the January 26, 2010 site visit during the harvesting. First, as discussed above, the FPR county forester decided that Plum Creek had “cut contrary” to its plan. Second, the county forester decided that Plum Creek had violated the AMPs in a number of respects. Later that day, the Plum Creek forester sent the FPR county forester an email expressing an intent to comply with program requirements and thanking the forester for cooperation in meeting those standards. The next day, the Plum Creek forester sent the county forester a formal letter describing the situation observed on January 26 and specifying steps Plum Creek would take in the future to comply with the requirements that bound it. It specifically described the steps it would take to correct the AMPs violations alleged by the forester and prevent AMPs violations in the future.
¶ 129. It is important to understand that the consequences for an AMPs violation and a violation of the harvest plan are different. Both can result in termination from the UVA program, but AMPs violations that result in unpermitted discharges of *246 waste into the waters of the state in violation of 10 V.S.A. § 1263(a) can result in civil penalties up to $10,000 per day for each day of violation. See 10 V.S.A. § 1274(a)(6). Such a discharge is also a crime that can result in imprisonment for up to six months. Id. § 1275(a). The FPR county forester found that the AMPs violations were “discharge resulting” such that the civil penalties and possible criminal liability were applicable. When charged with an AMPs violation, Plum Creek was forced to suspend the harvest in order to correct any AMPs violations.
¶ 130. The county forester never responded to the communications from the Plum Creek forester, but another site visit on AMPs compliance was planned with ANR staff responsible for AMPs enforcement. That occurred on February 9 but did not resolve the issues because snow had fallen on the site making it impossible to observe the alleged violations. In a February 18 letter, FPR outlined the steps needed for Plum Creek to come into compliance with the AMPs. Plum Creek hired a contractor to do the remedial work, and the ANR and FPR staff revisited the site on April 19, 2010. On April 27, FPR sent a letter to Plum Creek saying that Plum Creek was now in compliance with the AMPs. Plum Creek could not have moved forward with the harvest until all the AMPs issues were corrected; that is, when it received the April 27 letter.
¶ 131. Meanwhile the parties had a meeting with respect to compliance with the plan on February 18. The Plum Creek representatives hoped to learn at that meeting that there would be no further actions that would prevent it from moving forward with the harvest. Instead, they learned that the county forester was working on an adverse-inspection report which would lead to termination of Plum Creek from the current-use program. During March and April, the county forester continued to take measurements at the stands to complete the adverse-inspection report.
¶ 132. The adverse-inspection report was issued on April 26, 2010, a day before the AMPs compliance letter that would allow Plum Creek to move forward. If there was any question about the continuation of the harvest after the adverse-inspection report, on May 20, 2010, the Director of Forests for FPR sent a letter to Plum Creek saying that a draft of the adverse-inspection report was being reviewed in the “Waterbury office” and had been sent to the Tax Department recommending that all Plum Creek property be removed from the UVA program. The letter stated, *247 “Until all actions related to the potential UVA violation are completed, FPR will not be in a position to approve any new activities in the area referred to as Clough Brook North.” This was a statement that no further harvesting in the relevant area would be allowed pending resolution of this case. Plum Creek interpreted it as such an order and did no further harvesting in the stands involved. That order has been in effect since May 20 and up to today. It was in effect in November 30, 2010 when the Commissioner claimed in her letter that Plum Creek was using the unharvested part of the stands to claim compliance, the rationale endorsed by the majority.
¶ 133. The majority states that this dissent wanted FPR “to wait indefinitely to see if and when the landowner will continue cutting before bringing a violation.” Ante, ¶ 38 n.10. That is a mischaracterization of the facts and Plum Creek’s position, as well as that of this dissent. The FPR county forester began work on the adverse-inspection report immediately after the January 26 inspection. Plum Creek never could move forward after the January 26 inspection to complete the harvest either because of the AMPs issues or because of the adverse-inspection report and subsequent order denying approval for any further harvest activities. It is FPR, and not Plum Creek, that stopped harvesting activities to this day.[21]
¶ 134. In summary, the facts — if we decide it on the facts — support Plum Creek’s position, not that of FPR. In the end, however, facts are for the trial court and not this Court, and the trial court considered every one of the factual assertions of the majority and either rejected them or concluded that they did not support the Commissioner’s decision. We should affirm the trial court’s decision.
VI. Conclusion
¶ 135. In conclusion, I believe that this decision is wrong on multiple levels. It is wrong in determining whether FPR or Plum *248 Creek should prevail, and is wrong in ruling as a matter of law. The superior court correctly ruled that Plum Creek never violated its plan, the standard for determining whether it should be terminated from the UVA program, and should be affirmed on that basis. It is wrong by adopting a standard of judicial review that turns a governing statute into its exact opposite. It is wrong in rewarding an administrative process that is opaque and does not contain the minimum standards of fairness. Finally, it is wrong in misusing extreme deference to emasculate judicial review. The majority’s holding on standard of review has emasculated judicial review in this case.
¶ 136. I dissent. I am authorized to state that Justice Skoglund joins this dissent.

Appendix to Dissent

Relevant Content of Plum, Creek Prescr ipt ions

*249

*250

 The State alleged that Plum Creek had violated the Acceptable Management Practices (AMPs) for Maintaining Water Quality on Logging Jobs by a number of actions. The alleged violations were corrected shortly after they were identified. The AMPs violations were one of the grounds for the termination of Plum Creek from the current-use program and could have been grounds for the State to seek civil penalties in an enforcement action. It did not do so and, in fact, certified that Plum Creek was in compliance with the AMPs. Neither the majority nor this dissent has considered the AMPs compliance issue, except as stated in infra, ¶¶ 126-132, to explain why Plum Creek was prevented by FPR from finishing the harvest.

 Although the alleged improper conduct affected only a few hundred acres of land, all contiguous land owned by Plum Creek was removed from the current-use *217 program. Although the exact financial impact of the decision is not of record, it is alleged to be well in excess of one million dollars.

 The majority finds significant that Plum Creek “voluntarily ceased cutting” when concerns were raised. Ante, ¶ 38 n.10. I find significant that the county forester never stated that Plum Creek should complete its harvest and the forester would judge compliance based on the completed harvest. Also important is that FPR withdrew its approval for the harvest and only accepted that Plum Creek had resolved the AMPs issues after the termination decision was made. Despite Plum Creek’s immediate letter indicating how it would proceed forward in compliance with the plan and to resolve the AMPs issues, the forester went forward with the termination action in this case and never answered the letter. If there was an attempt to settle this controversy, the evidence lies in the administrative record that was never disclosed.

 Basal Area (BA) “is a measure of forest density based on the square footage of trees per acre.” Jones v. Dep’t of Forests, Parks & Recreation, 2004 VT 49, ¶ 10, 177 Vt. 81, 857 A.2d 271.

 As I discuss infra, ¶¶ 91-93, we have no way of knowing what information the Commissioner actually had because there is no record of the inputs to the Commissioner’s decision except for the county forester’s determination.

 I do not think the standard of review is determinative here for the reason stated in the text. If it were relevant, I would apply the standard of review for determinations of whether a permittee has complied with conditions of a permit. In Agency of Natural Resources v. Weston, we held:
In construing permit conditions, we rely upon normal rules of statutory construction. Our principal concern is to implement the intent of the draftpersons. Ordinarily, we do so by accepting the plain meaning of the words because we presume that they express the underlying intent. We also keep in mind, however, that because land-use regulations are in derogation of property rights, any uncertainty in their meaning must be decided in favor of the property owner. We must be particularly careful that the conduct complained of falls within the clear prohibition of a permit condition before requiring the landowner to pay a large monetary penalty. Finally, we must accord deference to the environmental court’s construction of a permit condition, particularly when the court’s expertise will assure consistent interpretations of the law.
2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.) (quotations and citations omitted); accord In re Barry, 2011 VT 7, ¶ 19, 189 Vt. 183, 16 A.3d 613. The lessons of these cases are that permit conditions are construed under normal rules of statutory construction and are construed to implement the intent of the draftsperson, who in this case was Plum Creek. The deference we give is to the trial court, not the administrative agency. Finally, a prohibition must be clear if, as is the case here, it will be the grounds for a large monetary penalty.

 Mollica was decided under 32 V.S.A. § 3758(a) because it involved an appeal from the PVR Director, not an appeal from the FPR Commissioner. At the time of the decision, the judicial review statute for such an appeal was identical to § 3758(d), the statute involved here. In 2013, § 3758(a) was amended to delete the cross-reference to the procedure in chapter 131, subchapter 2 of Title 32 and substitute “from there to Superior Court in the county in which the property is located.” 2013, No. 73, § 13. Section 3758(d) was not similarly amended. Because the amendment in § 3758(a) came after Mollica was decided, that decision is still controlling precedent on the meaning of § 3758(d).

 The county forester’s adverse-inspection report was sent to the Chief of Forest Management, and thereafter to Plum Creek. By letter of May 20, 2010, the Director of Forests of FPR notified Plum Creek that the investigation was complete and “was forwarded to the Waterbury Office for review” and sent to PVR, “recommending that the property be removed from UVA for harvesting contrary to the management plan.” Even this letter was not part of the record. The record did not include any information about the review in the Waterbury Office or any other action between the county forester’s report and the Commissioner’s decision.

 Even if there might be a case for discretion with respect to plan approval, there is none for filing an adverse-inspection report. FPR is required to file an adverse-inspection report if it “finds that the management of the tract is contrary to the . . . forest management plan.” 32 V.S.A. § 3755(c).

 Its decision was also based in part on the AMPs violations, and Plum Creek’s decision not to move forward until these were corrected. They were, however, corrected.

 The back and forth on this issue is a clear example why appellate factfinding is improper. There has never been factfinding on the question of whether Plum Creek could have completed the harvest because it was never an issue in the trial court or raised by the parties on appeal. For the reasons stated in the text, I believe that the majority’s characterization of the record on this point is clearly wrong. The alternative, if there is one, is to remand to the trial court to determine the facts.